BOULDEN *v.* HOLMAN, WARDEN.

No. 644.   Argued February 26, 1969.—Decided April 2, 1969.

*William B. Moore, Jr.,* by appointment of the Court, 393 U. S. 930, argued the cause and filed a brief for petitioner.

*David W. Clark,* Assistant Attorney General of Alabama, argued the cause for respondent.   With him on the brief was *MacDonald Gallion,* Attorney General.

MR. JUSTICE STEWART delivered the opinion of the Court.

The petitioner was convicted in the Circuit Court of Morgan County, Alabama, of first-degree murder, and

was sentenced to death in accordance with the verdict of the jury. After the Alabama Supreme Court affirmed the conviction, 278 Ala. 437, 179 So. 2d 20, the petitioner instituted this habeas corpus proceeding in the United States District Court for the Middle District of Alabama. District Judge Frank M. Johnson, Jr., denied relief, 257 F. Supp. 1013, and the Court of Appeals for the Fifth Circuit affirmed. 385 F. 2d 102, rehearing denied, 393 F. 2d 932, 395 F. 2d 169. We granted certiorari. 393 U. S. 822.

## I.

Although there was substantial additional evidence of the petitioner's guilt, his conviction was based in part on a confession he had made some days after his arrest. His request for habeas corpus relief rested on a claim that the introduction of that confession into evidence violated his rights under the Constitution.[1] Since his

---

[1] Two confessions were in fact obtained, although only the second was actually introduced into evidence. Both the District Court and the Court of Appeals properly noted that the second confession might have been the "end product of the earlier" one, in that "the accused [may have been] acutely aware that he had earlier made admissions against his interest and was, therefore, merely repeating his ostensibly uneraseable [sic] words of confession." 385 F. 2d, at 106. See *Darwin* v. *Connecticut,* 391 U. S. 346; *Beecher* v. *Alabama,* 389 U. S. 35; cf. *United States* v. *Bayer,* 331 U. S. 532, 540. Consequently, in order to determine whether the second confession was properly admitted, they passed upon the voluntariness of the first as well as the second confession. We have considered the record in like fashion.

There is evidence that even before his two formal confessions were obtained, the petitioner had, shortly after his arrest, admitted killing the deceased. The evidence was controverted, both as to whether the petitioner made any such admission and as to whether, if he did, the admission was voluntary. It is suggested in dissent that because the opinions of the District Court and the Court of Appeals do not explicitly refer to that evidence, it must be assumed that those courts did not consider it, and that the conclusions they reached should therefore not be sustained. We cannot agree. The

trial antedated our decisions in *Escobedo* v. *Illinois,* 378 U. S. 478, and *Miranda* v. *Arizona,* 384 U. S. 436, that claim is essentially a contention that under the constitutional standards prevailing prior to those decisions, his confession was made involuntarily. See *Johnson* v. *New Jersey,* 384 U. S. 719; *Davis* v. *North Carolina,* 384 U. S. 737.

After holding a full hearing regarding the issue and considering the state court record, the District Court, in an opinion applying the proper constitutional standards, was unable to conclude that the petitioner's confession was "other than voluntarily made." The confession, the court found, "simply was not coerced." 257 F. Supp., at 1017, 1016. The Court of Appeals, likewise applying appropriate standards, similarly could "find from the record here no plausible suggestion that Boulden's will was overborne . . . ." 385 F. 2d, at 107.[2]

Little purpose would be served by an extensive summation of the record in the District Court proceedings and in the state trial court. The question whether a confession was voluntarily made necessarily turns on the "totality of the circumstances"[3] in any particular case, and most of the relevant circumstances surrounding the petitioner's confession are set out in the opinions of the District Court and the Court of Appeals. Suffice it to say that we have made an independent study of the entire record[4] and have determined that, although the

petitioner has consistently contended that the events immediately following his arrest contributed to the involuntariness of his later confessions, and we are unable to assume that the evidence referred to was not considered by the District Court and the Court of Appeals. In any event, our own decision with respect to the voluntariness issue has been reached with that evidence fully in mind.

[2] In affirming the petitioner's conviction, the Alabama Supreme Court had reached a like conclusion. 278 Ala., at 446–452, 179 So. 2d, at 28–34.

[3] *Fikes* v. *Alabama,* 352 U. S. 191, 197.

[4] See *Spano* v. *New York,* 360 U. S. 315, 316.

issue is a relatively close one, the conclusion reached by the District Court and the Court of Appeals was justified.

## II.

In seeking habeas corpus the petitioner challenged only the admission of his confession into evidence, and his petition for certiorari was limited to that claim. In his brief and in oral argument on the merits, however, he has raised a substantial additional question: whether the jury that sentenced him to death was selected in accordance with the principles underlying our decision last Term in *Witherspoon* v. *Illinois,* 391 U. S. 510.

We held in *Witherspoon* that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U. S., at 522. In the present case, the record indicates that no less than 15 prospective jurors were excluded by the prosecution under an Alabama statute that provides:

> "On the trial for any offense which may be punished capitally, . . . it is a good cause of challenge by the state that the person has a fixed opinion against capital . . . punishmen[t] . . . ."[5]

That statutory standard has been construed by the Alabama Supreme Court to authorize the exclusion of potential jurors who, although "opposed to capital punishment, . . . would hang some men." *Untreinor* v. *State,* 146 Ala. 26, 33, 41 So. 285, 287.

However, as we emphasized in *Witherspoon,* "The critical question . . . is not how the phrases employed in this area have been construed by courts and commen-

---

[5] Ala. Code, Tit. 30, § 57.

tators. What matters is how they might be understood— or misunderstood—by prospective jurors." 391 U. S., at 516, n. 9. "The most that can be demanded of a venireman in this regard," we said, "is that he be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings. If the *voir dire* testimony in a given case indicates that veniremen were excluded on any broader basis than this, the death sentence cannot be carried out . . . ." *Id.,* at 522, n. 21. We made it clear that "[u]nless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position." *Id.,* at 516, n. 9.

It appears that at the petitioner's trial two prospective jurors were excluded only after they had acknowledged that they would "never" be willing to impose the death penalty.[6] Eleven veniremen, however, appear to have been excused for cause simply on the basis of their affirm-

[6] "THE COURT: . . . Do you have a fixed opinion against capital or penitentiary punishment?

"JOHN L. NELSON raised his hand.

"MR. HUNDLEY: Challenge.

"THE COURT: Do you have a fixed opinion against capital or penitentiary punishment?

"MR. NELSON: Capital punishment.

"THE COURT: You think you would never be willing to inflict the death penalty in any type case?

"MR. NELSON: Yes, sir.

"MR. HUNDLEY: We challenge.

"THE COURT: Defendant?

"MR. CHENAULT: No questions.

"THE COURT: Stand aside, Mr. Nelson.

"E. O. MOON raised his hand.

ative answers to the question whether, in the statutory language, they had "a fixed opinion against" capital punishment. The following excerpt from the record is typical of those instances:

> "THE COURT: Do you have a fixed opinion against capital punishment?
>
> "MR. SEIBERT: Yes, sir.
>
> "MR. HUNDLEY: We challenge.
>
> "THE COURT: Defendant?
>
> "MR. CHENAULT: No questions.
>
> "THE COURT: Stand aside. You are excused."

Two other veniremen seem to have been excluded merely by virtue of their statements that they did not "believe in" capital punishment.[7] Yet it is entirely possible that

---

"THE COURT: Do you have a fixed opinion against capital or penitentiary punishment?

"MR. MOON: Capital punishment.

"THE COURT: You mean you would never inflict the death penalty on [sic] any case?

"MR. MOON: That's right.

"MR. HUNDLEY: Challenge.

"THE COURT: Defendant?

"MR. CHENAULT: No questions.

"THE COURT: Stand aside, Mr. Moon."

[7] "THE COURT: What is your position on capital punishment or penitentiary punishment?

"MR. COLLIER: I don't believe in capital punishment.

"THE COURT: State?

"MR. HUNDLEY: Challenge.

"THE COURT: Any questions, Mr. Chenault?

"MR. CHENAULT: No questions.

"THE COURT: You are excused. . . .

.           .           .           .

"MR. PATTON: . . . and I don't believe in capital punishment.

"MR. HUNDLEY: I'll challenge Mr. Patton on that answer, on the ground he doesn't believe in capital punishment.

"THE COURT: Any questions by the defendant?

"MR. CHENAULT: No questions.

"THE COURT: We . . . will let you stand aside."

As the initial portion of this colloquy and that set out in foot-

a person who has "a fixed opinion against" or who does not "believe in" capital punishment might nevertheless be perfectly able as a juror to abide by existing law— to follow conscientiously the instructions of a trial judge and to consider fairly the imposition of the death sentence in a particular case.

It appears, therefore, that the sentence of death imposed upon the petitioner cannot constitutionally stand under *Witherspoon* v. *Illinois*. We do not, however, finally decide that question here, for several reasons. First, the *Witherspoon* issue was not raised in the District Court, in the Court of Appeals,[8] or in the petition for certiorari filed in this Court. A further hearing directed to the issue might conceivably modify in some fashion the conclusion so strongly suggested by the record now before us. Further, it is not clear whether the petitioner has exhausted his state remedies with respect to this issue. Finally, in the event it turns out, as now appears, that relief from this death sentence must be ordered, a local federal court will be far better equipped than are we to frame an appropriate decree with due regard to available Alabama procedures.

Accordingly, the judgment of the Court of Appeals is vacated, and the case is remanded to the District Court,

note 6 indicate, Alabama law also authorizes the exclusion of any potential juror who has a "fixed opinion against . . . penitentiary" punishment. Ala. Code, Tit. 30, § 57. Two veniremen were excused when they merely responded affirmatively to the disjunctively phrased question whether they had "a fixed opinion against capital or penitentiary punishment." It is thus not possible to discern from the record which type of punishment they objected to, although the more likely assumption would be that it was capital punishment. We did not in *Witherspoon* pass upon the validity of the "penitentiary" analogue to death-qualification of jurors, and we intimate today no opinion regarding that question.

[8] The Court of Appeals' decision was rendered prior to our decision in *Witherspoon*.

where the issue that has belatedly been brought to our attention may be properly and fully considered.

*It is so ordered.*

MR. JUSTICE BLACK, while still adhering to his dissent in *Witherspoon* v. *Illinois,* 391 U. S. 510, 532, acquiesces in the Court's judgment and opinion.

MR. JUSTICE FORTAS took no part in the consideration or decision of this case.

MR. JUSTICE HARLAN, whom THE CHIEF JUSTICE and MR. JUSTICE MARSHALL join, concurring in part and dissenting in part.

I agree that the case must be remanded to the District Court for a determination of the *Witherspoon* question, and I therefore join in Part II of the Court's opinion. However, I believe that on remand the District Court should also consider an aspect of petitioner's coerced confession claim which the opinions in the two courts below completely ignore, and to which this Court pays only passing attention.

The Court states that "[t]wo confessions were in fact obtained, although only the second was actually introduced into evidence." *Ante,* at 479, n. 1. The first of these was obtained during several hours of interrogation in the Limestone County jail on the night of petitioner's arrest, May 1, 1964. The second was obtained during petitioner's re-enactment of the crime on May 6. The courts below examined the circumstances in which both confessions were obtained, and concluded that both were voluntary. In my opinion this does not exhaust the coerced confession issue.

As the Court is compelled to recognize, petitioner made inculpatory statements on, not two, but *three* different occasions. The first of these was on the *after-*

*noon* of May 1, preceding the interrogation at the jail.[1] On that afternoon, petitioner was apprehended by law enforcement officers near the scene of the crime. According to petitioner, an officer of the Highway Patrol approached him and asked his name:

> "I told him; then he told me to run because he had been wanting to kill him a nigger a long time . . . . [H]e told me to run, and then he throwed the rifle up like he was getting ready to shoot there." Record Transcript 539–540.

Petitioner was taken to the scene of the crime, where he was placed, in handcuffs, in a police car alone with Highway Patrol Captain Williams. He was not given any of the *Miranda* warnings.[2]  As petitioner related:

> "Captain Williams asked me what had happened, and I started to tell him; he cussed me and told

---

[1] This appears not only from petitioner's and respondent's oral evidence at the habeas corpus hearing, but also from the transcript of the interrogation of the night of May 1, in which Captain Williams stated:

"Billy, now you understand what we are doing, we just want to talk to you, want you to tell us the truth about everything that happened today. *Now you know you talked with me today in the car and I just want you to repeat it all for Lt. Watts here . . . ."* Appendix 57. (Emphasis added.)

[2] "The review of voluntariness in cases in which the trial was held prior to our decisions in *Escobedo* and *Miranda* is not limited in any manner by these decisions. On the contrary, that a defendant was not advised of his right to remain silent or of his right respecting counsel at the outset of interrogation, as is now required by *Miranda,* is a significant factor in considering the voluntariness of statements later made. . . . Thus, the fact that Davis was never effectively advised of his rights gives added weight to the other circumstances described below which made his confessions involuntary." *Davis* v. *North Carolina,* 384 U. S. 737, 740–741 (1966).

It may additionally be noted that petitioner in the present case was a slight, sickly youth, with an I. Q. of 83.

me it wasn't . . . . I told Captain Williams I didn't do it, and he told me that I did . . . and he told me I was lying again. And he got mad and start cussing. . . . Well, he called me a little bastard and few more names . . . . Then he told me about if I didn't confess, that the officers that was wanting to kill me, he wasn't going to stop them. . . . I told him if he would get me out of there and wouldn't let them bother me, I would confess."

Later, two other officers got into the back of the car. One of them "asked me how old I was, and I told him, and he told me I was old enough to die." Record Transcript 544.

There were about 15 or 20 officers at the scene, some of whom were armed with rifles and shotguns. Captain Williams testified that a "pretty good size crowd" was gathering—"I would say, in my best judgment, twenty-five or thirty cars . . . and people milling around out in the road." Record Transcript 647–648. It was under these circumstances that petitioner first admitted to Captain Williams that he had committed the crime.

Apparently because of the hostile crowd, petitioner was finally carried away from the area in a convoy of three cars; he was taken to a jail in another county as a precautionary measure. Thereafter he made what the courts have treated as the "first" confession.

The District Court was not, of course, obliged to credit petitioner's testimony concerning the officers' threats—some of which, but by no means all, was controverted by respondent's witnesses. But the court did not even address itself to the testimony. Indeed, except for the oblique statement that "[t]here was no evidence . . . that the protection afforded Boulden on this occasion was inadequate," 257 F. Supp. 1013, 1014 (1966); 385 F. 2d 102, 104 (1967), neither of the courts below alluded to, let alone examined, the circumstances or the factual and

legal consequences of the events occurring on the afternoon of May 1, 1964.[3]

Without speculating as to the possible explanations for this disturbing lacuna in the opinions below, I would broaden the remand of this case so as to allow the District Court to consider whether petitioner was subjected to improper coercion on the afternoon of May 1, and what effect the events of that afternoon had on the voluntariness of the confession introduced into evidence at petitioner's trial. See *Darwin* v. *Connecticut,* 391 U. S. 346 (1968); *id.,* at 350 (separate opinion).

---

[3] In dissenting from the denial of rehearing *en banc,* Judge Tuttle, joined by Chief Judge Brown, focused on this issue:

"It is clear that there was an illegal interrogation and inculpatory statement obtained from this prisoner immediately following the shooting and it is clear beyond doubt that in the eliciting of the confession subsequently admitted by the State Court as a valid confession, much stress was placed by the officers on the fact that Boulden had already confessed under the circumstances which I find completely impermissible. . . . Here, it is clear beyond doubt that what has been held to be a legal confession was obtained by the officers repeatedly calling the accused's attention to the fact that he had already made sufficiently damaging statements and that they merely wanted him to fill in the details." 395 F. 2d 169 (1968).