McCALEB, Justice.
Appellant, Roy T. Mejia, was charged in four separate indictments with the murders, on April 13, 1966 in St. Mary Parish, of Barbara Verret, Brenda Ann Verret, Lucie Ann Verret and Robert Verret, Jr. Upon his arraignment on said charges, he moved for a change of venue claiming that he was unable to secure a fair trial in the Parish of St. Mary. After a hearing the judge granted a change of venue to the adjoining Parish of St. Martin, which is *313 also within the jurisdiction of the Sixteenth Judicial District Court. Appellant’s court-appointed attorneys, not being satisfied with the change of venue to the Parish of St. Martin, filed an application for rehearing and introduced evidence which persuaded the judge to recall his original order of transfer and enter a new order effecting a transfer of the matter to the Nineteenth Judicial District Court for the Parish of East Baton Rouge.
Thereafter, when the prosecution sought to proceed with the case in East Baton Rouge Parish, the judge of the Nineteenth Judicial District Court, to whom the matter was alloted, remanded the case on his own motion to the Sixteenth Judicial District Court on the ground that the second change of venue was contrary to the law of this State. The State excepted to this ruling and, thereafter, on writs granted under our supervisory jurisdiction, we reversed and the case was remanded for trial in the Nineteenth Judicial District Court for the Parish of East Baton Rouge. See State v. Mejia, 250 La. 518, 197 So.2d 73.
Upon the remand for trial below appellant, through his counsel, filed certain preliminary motions which were overruled and, subsequently at the trial, reserved numerous bills of exceptions. Following conviction and imposition of a death sentence, this appeal was taken, but only two of the reserved bills of exceptions have been perfected and presented for our determination. The first of these pertains to the manner in which the jury was selected and the other relates to the overruling of a preliminary motion to suppress certain evidence.
We initially consider the bills,[1] which were taken when the judge sustained the State’s challenges for cause of seven prospective jurors on the ground that they entertained conscientious scruples against the infliction of the death penalty and would not vote for the imposition of capital punishment. Counsel contend here that the voir dire examination of these seven jurors shows that they were not so opposed to capital punishment that they would not under any circumstances return a capital verdict which is essential under the decision of the Supreme Court of the United States in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).
A review of the evidence of the various prospective jurors questioned on their *315 voir dire examination convinces us that the complaints of appellant are not tenable. Notwithstanding that this case was tried prior to the decision in the Witherspoon case, a perusal of the lengthy examination of all prospective jurors on their voir dire discloses that the trial judge (now deceased) and the prosecuting attorney of the Nineteenth Judicial District Court were cognizant of the pendency of the Wither-spoon case in the Supreme Court at the date of appellant’s trial and were careful to explore in some detail the views expressed by those prospective jurors who entertained conscientious or religious scruples against the infliction of capital punishment.[2] The record reveals that the prospective jurors were present in the courtroom at the time the petit jury was selected. The jurors were questioned in panels of three, and they were first examined by the district attorney and then by the judge. Twenty-seven of these veniremen were excused because of their beliefs concerning capital punishment and of these, as we have heretofore stated, only seven are claimed by defense counsel to have been unlawfully excused as the questions propounded were insufficient to'meet with the standards prescribed by the United States Supreme Court in the Witherspoon case.
The record shows that each prospective juror was questioned by the State and then the judge, usually at some length, and they were invariably informed of their option to return a capital verdict or one without capital punishment in the event the evidence established appellant’s guilt beyond a reasonable doubt. And in no instance do we find that any of the seven jurors, or for that matter any of the others examined, were excused summarily on his statement that he did not believe in capital punishment. Conversely, a reading of the voir dire examination as a whole convinces us that each juror interrogated and challenged for cause was excused because he would have automatically voted against the imposition of capital punishment without regard to the evidence for the reason that his attitude concerning the death penalty was such as to prevent him from making an impartial decision in the case. It is true that the exact words of the Supreme Court in the Witherspoon case (see also Boulden v. Holman, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 [1969]; and Maxwell v. Bishop, 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221 [1970]) as to an automatic *317 vote against capital punishment were not employed but, after all, this is just a matter of semantics for each venireman declared without equivocation that “he could not” [3] because of his scruples return a capital verdict. For example, one of the seven jurors, Leopold D. Lee, after stating that he was conscientiously opposed to capital punishment, was asked:
“Q. And you would not, or you could not return a verdict that would result in the death penalty?
“A. My conscience would be offended by it * * *.
“Q. Well that is what you would be called upon to do. You couldn’t do it?
“A. No, I couldn’t do it. I think that there is room for people to do it.
“Q. But you don’t want to be one of them?
“A. Right.”
To the same effect is the statement of Louis Hicks, Sr., Elliot P. Jarreau, Clay J. Jarreau, Louis Calabrese and Charles Dale Hotard, who stated that they would not and could not return a verdict that would carry the death penalty.
We reach a like result with respect to the other challenged prospective juror, Ronald A. Sanders, part of whose voir dire examination is quoted in appellant’s brief. The part recited in the brief, if taken alone, might not suffice to comply with the Witherspoon dictum, for in that portion he only stated that he entertained conscientious scruples against the infliction of the death penalty for crime. However, when this statement is considered with the unquoted part of his testimony contained in he record, it clearly exhibits that this prospective juror could not and would not return a capital verdict under any circumstances.[4]
*319 Since we conclude that Bill No. 1 is without merit, we pass on to a consideraton of Bill of Exceptions No. 2. This bill was taken when the judge overruled appellant’s motion to suppress the introduction in evidence of the murder weapon, a 22-caliber revolver, on the trial of the case.
In order to properly understand the basis of the bill, it is necessary to state certain salient facts which culminated in appellant’s apprehension by the State officers. The murders were committed on or about April 13, 1966 at Berwick, Louisiana in St. Mary Parish, and appellant, the only suspect, fled from the parish and hid in the swamps and lowlands of adjoining parishes to elude apprehension by the authorities. During the period elapsing from the commission of the crimes and appellant’s apprehension seven days later, on April 20, 1966, it was determined by the investigating officers that the murder- victims had been shot with a small caliber (22) revolver. Ammunition for this weapon- was discovered on Bayou L’Ourse Road in Assumption Parish where appellant attempted to dispose of the bodies of his victims but was foiled by the arrival of two individuals in a pickup truck. Empty hulls which fitted a 22-caliber revolver were found in the house on Lima Street in Berwick, where the murders were committed, and pellets from a 22-caliber pistol had been recovered from the bodies of the murder victims. The investigating officers had also been informed by an acquaintance of appellant that he owned a 22-caliber revolver and, thus, it was known that appellant at one time had such a revolver in his possession. Also, sometime during the period of his flight from justice, the authorities were notified that appellant had stolen a rifle, and the officers, who first apprehended him in St. Charles Parish, were interested in information concerning this weapon. After having beer, warned of his rights at the time of his arrest, appellant, in response to questioning, stated to the arresting officers that he had disposed of the rifle by throwing it into the swamp, and that his pistol had been deposited with his luggage at the Greyhound Bus Station in the City of New Orleans.
When the officers arrested appellant, a search was made of his person and, in a wallet taken from his pocket, the officers found two claim tags for baggage at the bus station to which appellant had referred in his oral statement. The claim checks were then taken to New Orleans where the luggage was obtained and, thereafter, returned by the arresting officers to Westwego, Louisiana where appellant was being held. Sheriff Chester C. Baudoin of St. *321 Mary Parish, upon being informed of appellant’s arrest, was immediately flown to Westwego and assumed charge of the case. Upon the arrival of the luggage from the bus station, Sheriff Baudoin requested appellant to inform him as to the piece of luggage (there were two suitcases) in which the pistol was contained. Whereupon, appellant indicated the particular suitcase and assisted the sheriff in finding the gun.
The trial judge, in overruling the motion to suppress and permitting the introduction of the weapon in evidence, voiced the opinion that from the standpoint of time and place the activities of the officers were closely connected “ * * * with the initial arrest and search of the person of the accused”; that the search of the suitcase for the gun was substantially contemporaneous with and incidental to a valid arrest of appellant for the crimes, and that, considering all the circumstances, it was a reasonable search and seizure.
Defense counsel contend that the judge erred in his ruling. They argue the facts establish that the search and seizure of the luggage was unreasonable and violative of appellant’s constitutional rights, in that the officers acted unlawfully in removing the luggage from the Greyhound Bus Station without obtaining a search warrant to do so and, thereafter, searching one of the suitcases at Westwego without a search warrant. In support of their position, counsel cite several authorities from the Federal courts and rely heavily on Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); and Shipley v. California, 395 U.S. 818, 89 S.Ct. 2053, 23 L.Ed.2d 732 (1969).
This proposition cannot be sustained under the facts of this case. Preliminarily, we observe that a perusal of the authorities from the Supreme Court of the United States on the question of the validity of searches and seizures following a warrantléss arrest have not been uniform. However, prior to the Chimel and Shipley decisions, it was generally understood by this Court that, following a valid arrest, it was reasonable for the arresting officers not only to search the person of the arrestee for weapons or other evidence which might be valuable to the State in its prosecution of the crime, but that a general search of the house, structure, office or vehicle, in which the arrest was made, was also permissible. See United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950). The Chimel case, which contains a comprehensive review of all pertinent jurisprudence on warrantless searches and seizures, and notes the fact that the “pendulum” has swung for and against the validity of extensive searches in such matters, simply restricts the area in which such *323 a search may be made.[5] The substance of the opinion, as we read it, is that the arresting officers may not only search the arrestee for weapons which the latter might use to resist arrest or effect his escape, they may also search the immediate area into which the arrestee might reach “ * * * in order to grab a weapon or evidentiary items * * This area is declared to be “ * * * the area from within which he [the arrestee] might gain possession of a weapon or destructible evidence.”
So far as we have been able to find, the ruling in the Chimel case has not been as yet declared retroactive in operation. However, assuming that it is retroactive, we fail to discern that the decision is controlling under the facts in the instant matter.
In the first place, this case does not involve the search of a house, office or any other structure as an incident to a lawful arrest. Appellant a fugitive wanted for murder, was arrested in open country at or near the swamps in which he had been hiding before his capture. Unquestionably the -arrest was legal and the search -of his person,' and the seizure of the claim checks for his luggage containing the murder weapon, was a lawful incident thereto since he had informed the officers at the time of arrest that the pistol was in one of the suitcases checked at the bus station. Under these circumstances, we think, it was reasonable for the officers to have secured the luggage from the bus station upon presentation of the claim checks since appellant, as the depositor of the luggage, was not only the owner but constructively possessed it. The bus company, on the other hand, was holding the suitcases merely as temporary depositary and custodian. If, as we believe, the officers had the legal right to take the claim checks for the luggage from appellant’s person at the time of arrest, we perceive no constitutional basis for concluding that a search warrant was necessary, because the bus company was contractually obligated to deliver the luggage to the holder of the checks. It cannot be doubted that, if appellant had been in physical possession of the suitcases at the time of his arrest, the officers would have had the right to search and seize them as an incident to the arrest. So too, the situation here should be regarded as substantially the same from a constitutional standpoint for, albeit appellant did not have actual physical possession of the suitcases, the claim checks he held were the indicia of his ownership and his right to possession.
*325 Moreover, we believe that there is another valid ground upon which the seizure may be sustained as reasonable and, hence, constitutional — which is, that the officers being in legal possession of the claim checks for the luggage had the right to seize and subsequently search it since they had probable cause to believe that it contained evidence used in perpetration of the crimes — the murder weapon.
This view, we think, is supported by the recent decision of the United States Supreme Court in Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), where the court held that the warrantless search and seizure of a station wagon, after it had been brought to the police station following the defendants’ arrest, was nevertheless constitutionally permissible, not because the search could be sustained as an incident to a legal arrest, but because the officers had piobable cause to believe that the car contained the fruits of the crime. The court, in extending the ruling in Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), to apply to automobiles which were immobile at the time of the search and seizure, as distinguished from the cases holding that an exception is made in seizures of automobiles because of the fact that they may be easily moved before a search warrant may be obtained, declared in part:
“Arguably, because of the preference for a magistrate’s judgment, only the immobilization of the car should be permitted until ■ a search warrant is obtained; arguably, only the ‘lesser’ intrusion is permissible until the magistrate authorizes the ‘greater’. But which is the ‘greater’ and which the ‘lesser’ intrusion is itself a debatable question and the answer may depend on a variety of circumstances. For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.” (Italics ours.)
So we reiterate, although appellant was not in physical possession of the luggage at the time of the search, he had constructive possession as owner and depositor, and the evidence of his right to physical possession were the claim checks which the officers had lawfully acquired. Therefore, it matters not for constitutional purposes that the officers obtained the luggage at the bus station upon presentation of the claim checks instead of securing a search warrant for them, inasmuch as they had probable cause to believe that the suitcases contained evidence of the crimes, i. e., the murder weapon.
' For the reasons assigned, the conviction and sentence are affirmed.

. We say bills advisedly for, while counsel in their presentation here refer to Bills of Exceptions Nos. 12, 20, 24, 25, 33 and 34, an examination of the record reveals that the so-called bills refer to the sustaining of the State’s challenges for cause of seven prospective jurors and actually comprise a portion of a single bill of exceptions (No. 1) taken to the overruling of counsel’s objections to the judge’s ruling that these seven veniremen and certain others (27 in number) were ineligible to serve as they were opposed to the infliction of capital punishment and could not render such a verdict irrespective of the evidence presented.

. Indeed, this Court has recently noted in State v. Douglas, 256 La. 572, 237 So.2d 382, decided on June 8, 1970, that the same trial judge was aware in 1967, at the time of the trial of the case, of the pendency of the Witherspoon matter before the United States Supreme Court and, hence, questioned the prospective jurors at length respecting their convictions and beliefs as to capital punishment. The instant case was tried in October, 1967.

. Compare Maxwell v. Bishop, 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221 (1970), where the United States Supreme Court found that an affirmative answer to a question propounded to a prospective juror as to whether Ms conscientious scruples against capital punishment might prevent him from returning a capital verdict did not constitute a sufficient reason for maintenance of a challenge for cause.

. The record shows that Mr. Sanders was examined on his voir dire with a Mr. Starling and a Mr. Walsh. During the examination directed to Mr. Stalling, the prosecuting attorney propounded the following question:
, “ * ‡ * ■ But I am sure you know, and I am going to say it for the benefit of the other gentlemen, that in a capital ease such as this, assuming if you are chosen on the jury, and assuming you are convinced of the guilt of the accused, then after such time you are free to do one of two things, to return a verdict of guilty as charged, which carries the death penalty, or to qualify that verdict and return a verdict of guilty without capital punishment, which would carry a penalty of life imprisonment instead of the death penalty. And as between those two choices you are completely free to choose, and I tahe it from your previous answer that you could, I am not asking you what you would do, of course, but you could return a verdict that would carry the death penalty.”
*319 Mr. Starling: “Yes sir.”
*****
“Q. And you Mr. Sanders?”
Mr. Sanders: “No, I could not.”
“Q. You are against capital punishment for crime?”
Mr. Sanders: “Yes.” (Italics ours.)

. Compare, however, Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), and Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), holding that, for constitutional purposes, there is a difference between bouses and cars, the search of the latter not requiring the issuance of a search warrant when the arresting officers have reasonable grounds to believe it is-'being used to conduct illegal activities.