THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* SANTOS RODRÍGUEZ MARTÍNEZ, Defendant and Appellant.

No. CR-70-125. Decided September 19, 1972.

*Rosa Nilda Ponce Cáncel* for appellant. *Gilberto Gierbolini, Solicitor General,* and *Juan E. Brunet, Assistant Solicitor General,* for The People.

MR. JUSTICE RIGAU delivered the opinion of the Court.

Appellant was convicted by the court of murder in the first degree and sentenced to life imprisonment. On appeal he assigns that the trial court erred (1) in admitting in evidence the extrajudicial statements of appellant and the subsequent confession made to the prosecuting attorney and (2) in finding appellant guilty of murder in the first degree.

The facts may be summarized as follows: On August 18, 1969, in the afternoon, the girl Angelita Pacheco Vélez, 5 years old, disappeared from her home in Ward Almácigo Bajo of Yauco. The evidence does not show what efforts were

made on that day in her search. The next day, Santiago Guardiola, Local Director of the Civil Defense in Yauco, informed the happening to his immediate chief, Ramón Valentín Cruz, Regional Assistant Director of the Civil Defense in Mayagüez.

Ramón Valentín Cruz went to Ward Almácigo Bajo on Friday the 22d—the girl had not yet appeared—and some persons at that place informed him that Santos Rodríguez Martínez, appellant, would probably be the guilty person. At about 6 in the afternoon Valentín Cruz, Santiago Guardiola, and a detective went in an automobile near to appellant's home. All alighted from the automobile, Guardiola saw appellant with whom he started conversation and introduced Ramón Valentín Cruz to him as a Civil Defense officer. No policemen were present during that conversation; the two Civil Defense officers and appellant only. Guardiola told appellant that everybody said he was the most suspicious and asked him to tell him what had happened. Appellant told Guardiola and Valentín Cruz that he had buried the girl and voluntarily offered himself to help to find her. Nobody intimidated, nor threatened, nor used violence against appellant.

Appellant directed the Civil Defense officers to a sugarcane field close to the girl's home and pointed to an area where he had allegedly buried her. The search was unsuccessful. Appellant was taken to the Police station but the evidence does not show whether or not he remained under preventive custody on that night of the 22d. Next day, Saturday, August 23, the search was continued. Appellant was taken to the place of the search in a Police automobile and there he was detained. The car was parked on a path near the girl's home and it was kept under policemen's custody to prevent anyone from getting close to appellant. There were about 50 persons searching for the girl in the area in which appellant said that he had buried her. Rafael Hernández

Ramos, farmer who had known appellant for more than 20 years, was among those persons. Hernández Ramos asked permission from the Police to approach appellant and ask him where he had buried the girl. He said that he was doing that because "it was getting late" and because he thought that inasmuch as appellant had been his friend all his life, it was possible that he would tell him the exact place where he had buried the girl. They gave the requested permission to Hernández Ramos and the latter after greeting appellant told him:

"Look, Santos, notice this impatience, this restlessness there is, that girl's mother has not slept or eaten for six days, say, let us end this, why don't you just say where did you bury that girl?" Tr. Ev. p. 190.

Appellant answered that he did not know the exact place because he had been drunk and did not remember where it was. While appellant was talking with Hernández Ramos there was nobody else near them. A little later Binario Franceschini, master builder of the Municipality of Yauco, who was there because he had furnished picks and shovels which the Police had requested, with the previous consent of the Police, approached appellant and gave him a cigarette which the latter had asked for. They talked. Appellant told him that he had been in such a state that he did not even remember, that he had taken the girl and the girl screamed, and that when she screamed he hit her to stop the screams. He told him that when the girl screamed he gave her a blow on the side of her face, that when he saw that the girl fell he tried to dig to bury her but that when he saw that the girl moved he became scared and left her and fled. Franceschini told him that it could be possible that the girl was still alive, to try to remember and to show him the scene of the events. During the conversation appellant pointed toward a specific place. He told Franceschini that "for heaven's sake to look and see if they were lucky and could find her, that that was his only salva-

.tion." Franceschini got the people together and started to search by the area at which appellant had pointed. About an hour and a half later they found the girl. She was dead, on the ground and dressed, even with her undergarments. There is no evidence that the girl was sexually attacked.

It was determined that the cause of the girl's death was the rupture of the spinal cord, on account of the rupture of the first two cervical vertebrae which are joined to the cranium. This injury was caused by a blow.

Once the body was discovered appellant was taken to the office of Prosecuting Attorney Felipe Pérez Cruz in Ponce. The prosecuting attorney testified that he took down from appellant the personal information, the age, his civil status, and that then appellant told him that he wanted to confess. The prosecuting attorney testified that he warned appellant as to his constitutional rights, that he was entitled to be assisted by counsel, that if he confessed his confession could be used against him, that if he did not have any money a counsel would be called at the expense of the State, that he had a right to call a relative by phone, and that if he made any statement it would be voluntary. Inasmuch as appellant insisted on his desire to make a statement, then, the prosecuting attorney continued testifying, he tried to locate lawyers by phone, that it was Saturday afternoon and that he was able to contact attorney Clavell. Appellant and the prosecuting attorney went to Mr. Clavell's office. The prosecuting attorney explained to Mr. Clavell the purpose of his visit and the latter accepted and took appellant into his office. While they talked the prosecuting attorney and the Police waited outside the office. The prosecuting attorney testified that appellant and Mr. Clavell conferred in private for over fifteen minutes. After that interview appellant and Mr. Clavell came out of his office and appellant again expressed to the prosecuting attorney his desire to make a statement.

On the way back to the prosecuting attorney's office, appellant and the prosecuting attorney met attorney Iván Ayala. The prosecuting attorney stopped him, Ayala alighted from his automobile, the prosecuting attorney told him what it was about and had appellant talk with Mr. Ayala. He heard that Ayala gave the legal warnings to appellant. Ayala and appellant conferred for about five minutes. Appellant reiterated his desire to make a statement. They returned to the prosecuting attorney's office and there the latter took appellant's sworn statement.

In his sworn statement appellant states that he went by the back part of the girl's house and signaled her to come to him. Appellant was carrying some candies. The girl went towards appellant, and both walked along the margin of a brook and upon reaching a cane field he gave the candies to the girl. Then he laid her down and passed his penis over the girl's panties which covered the girl's genital organs. The girl started to cry and appellant hit her with his fist. Upon seeing that she was unconscious he left her and went away. After making the statement when the prosecuting attorney asked him if he wanted to add anything else appellant stated: "Well, that now I feel much more at ease."

The prosecuting attorney's statement and appellant's statement are to the effect that at no time was appellant the object of intimidation or violence. Appellant testified that when he had the interview with Mr. Clavell the latter explained to him about his right not to testify and asked him if he had been hit or threatened, and appellant answered no, that they had behaved well and that "he had to say this in order to feel at ease." No evidence for the defense was heard.

As we said before, appellant assigns on appeal the two errors aforementioned. As to the first one, through which he challenges the admission in evidence of appellant's extrajudicial statements and the confession before the prosecuting attorney, appellant alleges that he was the victim of psycho-

logical and physical pressure which render his statements to the Civil Defense officers involuntary, and that the confession offered before the prosecuting attorney, even though it complies with the required constitutional formalities, was the product of previous incriminatory statements made to the Civil Defense officers and that therefore should have been excluded.

 We find nothing in the evidence to justify the conclusion that appellant's statements to the Civil Defense officers were induced by any kind of intimidation whatsoever. Appellant made said statements in a voluntary manner, just as he made them also to his old friend, the witness Hernández Ramos. The voluntary statements made to relatives, friends or acquaintances do not need to be preceded by any legal warnings whatsoever. See cases in 31 A.L.R.3d 565, 671–672.

The confession offered before Prosecuting Attorney Pérez Cruz was made after previous compliance with the requirement of giving appellant the required legal warnings and there is nothing to show that it was not a voluntary confession or that it was the result of beatings, threat, or fraud.

In *Boulder* v. *Holman*, 394 U.S. 478, 479 (1969), it was said that the question as to whether or not a confession was voluntary depends on the totality of circumstances and in that case it was concluded that it had been voluntary. In *Beecher* v. *Alabama*, 389 U.S. 35, 38 (1967), the extrajudicial confession was obtained by the police under circumstances which the Supreme Court of the United States called gross coercion. The accused, already wounded, was ordered by the police at gunpoint to make a statement. Afterwards, while he was in the hospital under the influence of sedatives, he was ordered to tell the investigators "what they wanted to know." Under those circumstances, the confession could not prevail. In *Darwin* v. *Connecticut*, 391 U.S. 346 (1968), again the situation was very different from the case at bar. There appellant was held incommunicado and his repeated

requests to communicate with other persons were denied. His counsel made 25 telephone calls during three consecutive days to the police to communicate with the accused, without success. Under those circumstances the police obtained a confession from the accused which, of course, resulted inadmissible.

■ The circumstances in the case at bar are very different. The prosecuting attorney was extremely diligent. He gave the legal warnings to him, was able to find a lawyer for him on a Saturday afternoon, and in view of appellant's insistence on confessing he procured for him a conference with a second attorney. These attorneys informed appellant of his rights and thus informed, appellant insisted on making a statement.

Those who drafted the constitutions of Puerto Rico and of the United States certainly had in mind to prohibit that no one be *compelled* to incriminate himself through his own testimony, but they did not intend to prohibit an offender from freely and voluntarily confessing his crime thus making peace with his conscience and with society. Those two constitutions have as one of their objectives to protect the freedom of the consciences of the human beings, not to chain them to evil. Said constitutions do not require that a person who has become an offender is compelled besides to be a liar or a perjurer all his life. To tell the truth, even though the results are bitter, is ethical. The constitution is not at variance with ethics. We understand that the first error assigned was not committed.

■ Through the second error assigned it is maintained that the trial court erred in finding appellant guilty of murder in the first degree. This error was committed. There is no doubt that we are dealing with a murder but the evidence does not show that the same was performed deliberately and with malice aforethought. The evidence does establish (to carry the candies, to go to get the girl at her home,

etc.) that there was premeditation and deliberation to commit a violation of § 260 of the Penal Code, 33 L.P.R.A. § 966, which consists of performing lascivious acts with a minor under 14 years old. The death occurred as a result of the blow that appellant gave the girl when the latter started to cry, probably because of fear. When the girl, already unconscious on the ground, moved, appellant became scared and fled. Had he had the deliberate intent of killing her there he would have done it instead of fleeing and leaving her there, possibly alive.

In view of the conclusion which we have reached as to this second error, the judgment rendered in this case should be modified in the sense of finding appellant guilty of murder in the second degree and of imposing upon him a term of from 12 to 20 years in the penitentiary, and as thus modified it should be affirmed.