LEIGH M. CLARK, Retired Circuit Judge.
Mark Steven Fuller was tried under a two-count indictment, the first count charging him with the crime of burglary in the third degree in knowingly entering or remaining unlawfully in a building with the intent “to commit a crime therein, to-wit: Theft, in violation of Section 13A-7-7 of the Alabama Criminal Code,” which by subsection (b) thereof is classified as a Class C felony. In the second count, it was charged that he “did intentionally receive, retain, or dispose of stolen property, to-wit: one sofa, one chair, and two end tables of the total value of Twelve Hundred Dollars, the property of Mary Walters knowing that it was stolen or having reasonable grounds to believe it had been stolen and not having the intent to restore it to its owner, in violation of Section 13A-8-17 of the Alabama Criminal Code.” After all the evidence had been taken and the attorneys had completed their arguments to the jury, the court charged the jury, correctly, we think, and neither party on appeal contends otherwise, that as the same personal property was involved in both counts of the indictment, the jury could find defendant guilty under one of the counts only. The jury found him guilty under the second count, but in doing so, it stated in its verdict that it found him guilty of receiving stolen property in the second degree, a lesser included offense to that of § 13A-8-17 and one distinguishable materially as applied to the evidence in the instant case by part of its definition of the crime as “Receiving stolen property ... Which, exceeds $100.00 in value but does not exceed $1,000.00 in value,” while receiving stolen property in the first degree as proscribed by § 13A-8-17 provides in pertinent part that the property involved shall be in excess of $1,000.00 in value.
After the judgment of conviction, defendant was given due notice that he would be proceeded against under the Habitual Felony Offenders Act. Upon the sentence hearing, it was shown that defendant had been previously convicted of two previously committed felonies. The court sentenced him to imprisonment for ten years, the maximum provided for the Class C felony of which he was adjudged guilty, according to § 13A-5-6(a)(3), and the minimum punishment when the criminal defendant had been previously convicted of any two felonies, according to § 13A-5-9(b)(1) when considered with § 13A-5-6(a)(l).
Although only one issue is presented in the brief of counsel for appellant, namely, that the trial court erred in admitting into evidence an inculpatory statement made by the defendant to a police officer, we deem it necessary to a correct understanding and discussion of such issue to give the following resume of the material evidence in the case. In doing so, we follow substantially the “Statement of the Facts” set forth in brief of counsel for appellant, which appropriately contains testimony heard by the trial judge out of the presence of the jury in connection with defendant’s motion to suppress or the like, as well as testimony given in the presence of the jury.
Mrs. Mary Walters was the first witness in the case. She testified that on September 21, 1983, the defendant, with two other persons, assisted her in moving her living room suite from where it had been to the house that Mrs. Walters was to occupy as her residence, which house had been previously occupied by defendant and' other *1161 members of defendant’s family. We quote from her testimony:
“Q. All right. Now, when you left your house on the 21st, was there anybody inside that house?
“A. No.
“Q. And was your living room suite inside that house?
“A. Yes.
“Q. When you left that house, did you lock it?
“A. Yes.
“Q. Did you at any point return to that house?
“A. No, not that night.
“Q. Okay. Did you return to that house any time the next day?
“A. Yes.
“Q. All right. Approximately what time?
“A. Ten-thirty or eleven.
“Q. Did you see anything unusual when you got to your house?
“A. Yes. The window was broke, the back door opened.
“Q. The window was open?
“A. Uh-huh.
“Q. And the back door was opened?
“A. Uh-huh.
“Q. And did you go inside your house?
“A. Yes.
“Q. Did you see anything unusual then?
“A. Yes.
“Q. What did you see?
“A. I didn’t have a living room suite and I didn’t have six or eight boxes of my merchandise.
“Q. Now, this living room suite, what was the value of this sofa and this chair and two end tables?
“A. Twelve Hundred Dollars.
“Q. Now, at any point did you register a complaint with anyone?
“A. Yes.
“Q. Who did you call?
“A. Fultondale Police.”
The witness further testified on direct examination that Detective Mancel Sharp of the Fultondale Police came to her house on the afternoon of September 22, 1983, that she registered a complaint with Detective Sharp, and that sometime thereafter she went with Detective Sharp to Adamsville “with a search warrant and got my living room suite back.” On cross-examination, Mrs. Walters testified in part as follows:
“Q. The furniture that you got back that you testified to on direct examination, where did that come from?
“A. It came from Gene McAnnally’s house in Adamsville.
“Q. And how long after the 21st was that?
“A. I don’t remember. A month or two.
“Q. Do you have a judgment? You say a month or two is your best judgment?
“A. Yes.
“Q. And where was the furniture at Gene McAnnally’s house?
“A. His den.
“Q. It was being used as furniture for him and his family, I guess?
“A. Yes.”
Mr. Gene McAnnally testified as a witness for the State. According to his testimony, he paid the defendant four hundred dollars for the particular furniture. The following is a part of his testimony:
“Q. Did Mr. Fuller help you put this furniture in your house?
“A. No, sir.
“Q. How did he deliver the furniture? “A. Well, he helped me load it on the truck.
“Q. Did he help you load it on your truck?
“A. Yes, sir.
“Q. And then you transported it to your house; is that right?
“A. That is correct.
“Q. Mr. McAnnally, where is your house?
“A. Well, at that time I lived in Garden-dale, but I moved to Graysville.

“Q. And where did you take possession of this furniture from Mr. Fuller?
*1162 “A. We were at a house over in Coal-burg.
“Q. Is that here in Jefferson County?
“A. Yes, sir.
“Q. Is that in the Birmingham Division of Jefferson County?
“A. Yes, sir.
“Q. All right. At any point, Mr. MeAn-nally, did anyone come to your house concerning the furniture?
“A. The Fultondale Police.
“Q. And did the Fultondale Police have anyone with them?
“A. Yes, sir.
“Q. Who did they have with them?
“A. This lady right here.
“Q. And what if anything did they want?
“A. They said that it was stolen and the property belonged to her.
“Q. In your presence did this lady identify that furniture as hers?
“A. Yes, sir.
“Q. What if anything was done with the furniture at that time?
“A. They loaded it on a truck and left with it.
“Q. Mr. MeAnnally, when you purchased this furniture for Four Hundred Dollars from Mr. Fuller, did you have any idea it was stolen?
“A. No, sir.”
On cross-examination of Mr. MeAnnally, the following was part of his testimony:
“Q. ... Now, Mr. MeAnnally, pursuant to that search warrant and the items that were recovered out of the house there, Mr. Sharp charged you with buying and receiving stolen property?
“A. Yes, sir.
“Q. He did charge you, didn’t he?
“A. Yes, sir.
“Q. And subsequently that charge being made against you and a warrant being served on you, those charges were dismissed, weren’t they?
“A. Yes, sir.
“Q. By Mr. Sharp?
“A. I don’t know who they were dismissed by.
“Q. Who told you they were dismissed?
“A. My lawyer.
“Q. Did you know Mark Fuller prior to this occasion—
“A. No, sir.
“Q. Did Mr. Sharp tell you that you were going to have to come up here and testify against Mark Fuller in court?
“A. No, sir, he didn’t tell me I had to, no, sir.
“Q. Prior to the dropping and the buying and receiving count against you, did he tell you that?
“A. Well, my attorney said I may be subpoenaed to testify.
“Q. Have you ever been convicted of a crime involving moral turpitude?
“MR. ANDERTON [Assistant District Attorney]: Your Honor, we are going to object to that.
“MR. DUNN [Defendant’s Attorney]: Goes to his credibility.
“THE COURT: Overruled. You can answer.
“THE WITNESS: No, sir.
“Q. Are you right sure about that?
“A. Yes, sir.”
The next witness in the case was Officer Mancel Sharp, but, before he testified in the presence of the jury, counsel for one or both of the parties had apparently let the trial judge know that he would be expected to testify as a witness for the State as to an inculpatory statement made by defendant and that one or both of the parties would like to interrogate him voir dire out of the presence of the jury in order for the trial court to be better able to determine whether the proposed inculpatory statement of defendant would be admissible in evidence. In his testimony on voir dire, he stated that during his investigation of the loss of the furniture as reported by Mrs. Walters, he talked with Mrs. Walters first and then with Gene MeAnnally, and in his effort to locate Mr. Fuller he talked to a girl whom Mr. Fuller was dating at the time, told her that he was looking for Mark Fuller and if she saw Mark Fuller to tell him. His testimony continued as follows:
*1163 “... So, I was at the office one day and I received a phone call from Mark Fuller. “Q. Tell us about what phone call consisted of.
“A. It was — Mark—we were talking about the burglary. And I told Mark that Ms. Walters suspected him in the burglary and I wanted to talk to him about it. And he said ‘I’m not going to talk to you on this phone because it is recorded.’ I said ‘Well, I’ll meet you somewhere in Fultondale.’ He said ‘I’m not going to talk to you in Fultondale because I don’t want anybody seeing you talking to me.’ I said ‘Well, you name it.’ He said ‘McDonald’s in North Birmingham,’ gave me a date. So, we went to McDonald’s.
“Q. Go ahead.
“A. We went to McDonald’s in North Birmingham and met him. Him and his sister was there.
“Q. At that point did you place Mr. Fuller under arrest?
“A. No, sir.
“Q. Did you handcuff him?
“A. No, sir.
“Q. Where did you have this conversation with Mr. Fuller?
“A. Mr. Fuller, his sister and I went inside McDonald’s and sat down in a booth. We went up and got us a cup of coffee and I think Mark got something to eat, I am not for sure. But I know we got coffee and sat down in a booth and started talking.
“Q. And after this conversation with Mr. Fuller, did you place Mr. Fuller under arrest?
“A. No, sir.
“Q. Did he leave?
“A. Yes, sir.
“Q. And who did he leave with?
“A. His sister, the same way he came up.
“Q. Tell the court the conversation that took place.
“A. Well, I told Mark that I wanted the furniture, I felt that he knew where it was and I wanted it back for the lady that had been burglarized. And he in turn told me that he would give me the information provided that I come up with Seventy-five Dollars. And I told him, I said ‘For what?’ And he said T have got a case pending before Judge Montgomery now on a theft of rings, and I have got to buy the rings back and get it back down to the courtroom for Judge Montgomery to send me to prison.’ I then told him, I said ‘I’m not going to ask or give you Seventy-five Dollars for any kind of information that I don’t know is worthwhile.’ I said ‘Furthermore, I don’t have the Seventy-five Dollars, the City of Fultondale is not going to put up Seventy-five Dollars.’ He said ‘Well, Mary will put up Seventy-five Dollars to get her furniture back.’ And I said T will ask Mary, but I’m not going to Mary until I know where the merchandise is.’ And at this time Mark Fuller told me that he and a white male by the name of Ken Goodwin broke into Mary Walters’ house, stole the furniture, hauled it to an area in Coalburg, stored it in an outside open type garage thing and that then he and a boy named Woods sold it to Gene McAnnally, the same man that he had to get the rings back from.
“Q. All right. Where was Mr. Fuller sitting in relationship to you?
“A. When he told me all of this?
“Q. Yes.
“A. Across the—
“Q. Across the table?
“A. —the table.
“Q. Where was his sister?
“A. Beside him.
“Q. Were you leaning back or were you directly in Mr. Fuller’s face?
“A. I was sitting across from the sister, he was sitting on the side of her.
“Q. Was he up against the wall or in the aisle?
“A. No, we were sitting out in the open space.
“Q. Did you threaten Mr. Fuller in any way in order to get him to talk to you? “A. No, I was trying to help him off of dope.
*1164 “MR. DUNN: We object to that, may it please the court, move it stricken from the record.
“THE COURT: When we get into the jury work in this, now, please don’t say that.
“Q. Okay. Did you threaten or coerce him in any way in order to get him to take the statement?
“A. No.
“Q. Did you offer Mr. Fuller any reward or hope of reward in order to get him to make a statement?
“A. No, sir. The only thing that I told him I would check with the victim to see if she would get the Seventy-five Dollars.”
The following is a part of the material testimony of Officer Sharp on. voir dire cross-examination by defendant’s attorney:
“Q. At some point in time, Mr. Sharp, you arrested Mark Fuller, did you not?
“A. Yes, sir.
“Q. When was that?
“A. I arrested Mark Fuller on November 18th, 1983 at 11:49 a.m. on a Friday.
“Q. November the what?
“A. The 11th, 1983, 11/18/83.
“Q. And how long after you had talked to him and his sister at McDonald’s did you arrest him?
“A. It was — I—it was — it was around I think I talked to him on about November the 9th.
“Q. Mr. Sharp, during the course of— well, let me put it this way. On November the 9th, when you talked to Mark Fuller, was he at that time a suspect in the investigation of the burglary of this lady’s house?
“A. Yes, he was a suspect when I was talking to him.
“Q. Was it on November the 10th that you ran your warrant?
“A. It was on November the 11th, I believe. It was November the 11th, the same day I run the search warrant, I turned the property over to the victim.
“Q. Did she take custody of it right there on the spot?
“A. No.
“Q. Tell me about that.
“A. We had a — I carried a uniformed police officer with me in a pickup truck and we hauled it back from Graysville to the victim’s house, or loaded it and put it back in her house and she signed a release to it.
“Q. Did you ever charge McAnnally in this case?
“A. Yes, I did.
“Q. And you cut him loose on this case subsequently, didn’t you?
“A. Yes, sir, we dropped charges at the preliminary.
“Q. What was the reason for that?
“A. He — after we got with the man and the D.A., the man had a clean record, he paid a substantial amount for the furniture. And the D.A. felt that it was best to drop the charges on the man.
“Q. Did you tell him he was going to have to testify against Mark Fuller?
“A. I told him he would be subpoenaed in the case. I didn't tell him he had to do anything.
“Q. Had you talked to Mark Fuller— has he made any other statements to you other than this one you are telling us about at McDonald’s?

“A. After I met with Mark at McDonald’s and then I met — came back and got in touch with my victim and then my victim gave me Seventy-five Dollars and then got in touch with Mark. And Mark came by my office and the Sergeant’s office at the Fultondale Police Department and I gave him the Seventy-five Dollars. And we had a conversation then. And it’s not a lie.
“MR. FULLER: It is a lie.
“Q. What was the substance of that conversation?
“A. He wanted the Seventy-five Dollars.
“Q. All right. You gave him the Seventy-five Dollars. What I am getting at, *1165 was there any talk between you and him?
“A. Yeah.
“Q. Questions and answers about the crime itself?
“A. Yeah. He asked me to wait and give him time to get the rings back from McAnnally before I run the search warrant.
“Q. I am talking about the burglary crime, particular crime, was there any conversation about that?
“A. I tried to get him to turn State’s evidence on Ken Goodwin.
“Q. Mr. Sharp, would you agree that at the time you had the conversation with Mr. Fuller at McDonald’s, that your investigation was focused on him at that time?
“A. My investigation was focused on anybody in town that I thought had anything to do with it.
“Q. But you thought he had something to do with it, did you not?
“A. Yes, sir.
“Q. In fact, you were pretty sure he had something to do with it?
“A. Yes.
“Q. Prior to his making this statement to you about the furniture, you didn’t give him his Miranda warnings, did you? “A. No, I never gave him any Miranda warnings at all.”
Promptly after Officer Sharp finished his testimony on voir dire for examination by both parties, defendant called his sister, Vicky Fuller, for her testimony on voir dire. Her testimony is correctly summarized in the brief of counsel for appellant as follows:
“That she was the sister of defendant and had accompanied him to the meeting (at McDonald’s in North Birmingham) with Detective Mancel Sharp. She was present when Mr. Sharp told the defendant that if the defendant would tell him where the furniture was, he would not make any eases on him. She also confirmed the fact that arrangements were made between Fuller and Sharp for Fuller to receive $75 in exchange for information about the furniture stolen from Ms. Walters.”
At the conclusion of the testimony taken on voir dire of Detective Sharp and Miss Vicky Fuller, there was considerable argument by counsel for the parties pro and con as to defendant’s motion to suppress the proposed testimony before the jury of the testimony of Officer Sharp as to the incul-patory statement made by defendant to Officer Sharp. At the conclusion of the argument out of the presence of the jury, there was a brief recess, and then the following occurred out of the presence of the jury:
“THE COURT: I am ruling adversely to Mr. Fuller on the Motion to Suppress his statement, finding that there was a noncustodial conversation initiated by the defendant. Furthermore, I am satisfied that by a preponderance of the evidence that the statement was made voluntarily. I have instructed Mr. Anderton [Assistant District Attorney] to tell Mr. Sharp not to refer to any drug addiction and not to refer to any allegations about stolen ring eases, okay?
“MR. DUNN: Okay. And we except to the Court’s ruling.
“THE COURT: Very good.
“(Whereupon, at 2:25 p.m. the jurors were brought in and the following was had and done before the court and jury:)
“THE COURT: Ladies and Gentlemen, I don’t think there will be any more interruptions. I do apologize to you. Okay, Mike.
“MR. ANDERTON: The State calls Man-eel Sharp.
“(Whereupon, Mancel Sharp, having first been duly sworn, was examined and testified as follows:)”
As indicated above, we see no good reason for summarizing the testimony before the jury of Officer Sharp inasmuch as it was in all material respects substantially *1166 the same as his testimony on voir dire interrogation.
During the course of the oral charge to the jury, the trial judge stated the following:
“... Remember the theory, the law says that a thief cannot receive stolen property from himself. You have got to think about that before it makes sense, a few times, you have got to think about that. You must first assess Count One, the burglary count. And then in doing that, simply you must only determine' whether or not Mr. Fuller knowingly entered into or remained unlawfully in this woman’s house with the intent to commit a crime, with the intent to steal, with the intent to steal a sofa and a chair and whatever else was in here, two end tables. Did he do that? Did he enter — knowingly enter or remain unlawfully in her home or building with the intent to steal these goods? If he did, find him guilty of burglary in the third degree, if you are convinced beyond a reasonable doubt or to a moral certainty that he did these things.
“... But, if you are not convinced that he is either guilty of burglary in the third degree or if you are not convinced that he is the thief of the goods, you go to the receiving count, and receiving is — I have got it marked in the book, receiving stolen property is the designation of the offense.

“... If you find that he is guilty of receiving stolen property, you have to assess the degree by figuring the value. If you are convinced beyond a reasonable doubt that the goods had a value in excess of a Thousand Dollars, then it is first degree.
“If you are not and you find that it is less than a Thousand but more than a Hundred Dollars in value, market value, then it is second degree.”
We cannot agree with the position taken by appellant’s counsel in his brief in support of his contention that the trial court committed error prejudicial to defendant in admitting into evidence over the protest or objection of defendant the inculpatory statement made by defendant to Officer Sharp. In reaching this conclusion, we have considered the authorities cited by appellant, including particularly the case of Eakes v. State, Ala.Cr.App., 387 So.2d 855 (1978), including the statement contained therein at 387 So.2d 858, -59, correctly quoted in appellant’s brief as follows:
“A confession is presumed to be involuntary. Before its admission into evidence there must be evidence addressed to the trial judge sufficient to rebut that presumption and a showing that the confession was made without influence of either hope or of fear, unless the attending circumstances affirmatively disclose the voluntariness of the confession. Wallace v. State, 290 Ala. 201, 275 So.2d 634 (1973); Bush v. State, 282 Ala. 134, 209 So.2d 416 (1968). In order to be admissible a confession must be free and voluntary and cannot be the result of any direct or implied promise, however slight. Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); Shotwell Mfg. Co. v. United States, 371 U.S. 341, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963); Bell v. Alabama, 5 Cir., 367 F.2d 243, cert. denied, 386 U.S. 916, 87 S.Ct. 859, 17 L.Ed.2d 788 (1966); Wallace, supra. The question of whether a confession was obtained by coercion or improper inducement can be determined only by examination of all the attendant circumstances. Boulden v. Holman, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969); Wallace, supra. Each case must stand or fall on its own merits for the constitutional inquiry into the issue of voluntariness requires more than a mere ‘color-matching of cases’. Beecher v. Alabama, 389 U.S. 35, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967). The true test of determining whether extrajudicial confessions are voluntary is whether the defendant’s will was overborne at the time he confessed and therefore not the product of a rational intellect and a free will. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); Elliott v. *1167 State, 338 So.2d 483 (Ala.Cr.App.1976) [emphasis supplied].”
We are of the opinion that in the instant case all of “the attending circumstances affirmatively disclose the voluntariness of the” inculpatory conduct and statement of which appellant now complains. Although appellant does not purport to contend in his brief that the failure of Officer Sharp to give defendant the warnings required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), precluded the admission of evidence of defendant’s incul-patory statement and conduct, it should be noted, perhaps, that such warnings are required in custodial interrogations only, which are defined as “questioning initiated by law enforcement officer after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.” 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706 (footnote omitted).
We conclude that the only issue presented by appellant is not well taken and that the judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur.