256 So.2d 154 (1971)
Johnny Daniel BEECHER
v.
STATE of Alabama.
7 Div. 846.
Supreme Court of Alabama.
October 7, 1971.
After Remandment December 9, 1971.
Rehearing Denied January 13, 1972.
*156 J. Allen Lee, and Joe M. Dawson, Scottsboro, for appellant.
MacDonald Gallion, Atty. Gen., and David W. Clark, Asst. Atty. Gen., for the State.
PER CURIAM.
On June 15, 1964, Johnny Daniel Beecher, a convict, who may hereinafter be referred to as "defendant," "appellant," or "Beecher," escaped from a road crew in Jackson County while the crew of convicts was building a fence near the right-of-way of a highway. The place from which the defendant escaped was about eight-tenths of a mile from the home of Mr. and Mrs. Raymond Chisenall who lived in the Fabius community. Mrs. Chisenall's body was found the next day, some distance from her home, in a shallow hole covered with dirt and leaves. Her feet and hands were tied. *157 She was gagged and blindfolded. Expert testimony and other evidence revealed that she met her death by manual strangulation and that she had been raped.
While fleeing from Tennessee police officers near South Pittsburg, Tennessee (which is located near the State line which separates Jackson County, Alabama and the State of Tennessee), Beecher was shot in the leg by a rifle bullet and arrested during the early morning of June 17, 1964. He was carried to a hospital in South Pittsburg and given first aid treatment. Evidence depicted his condition when he arrived at the hospital as being in a great amount of pain, he having sustained a gunshot wound in his leg which shattered his tibia. He was given injections of morphine, one intravenously and one intramuscularly.
His leg was not set at the Tennessee hospital, but splinted so he could be transported by ambulance to Kilby Prison Hospital near Montgomery where he received treatment for his leg that day. Later his leg was amputated.
On July 29, 1964, the Grand Jury of Jackson County, Alabama returned an indictment against the defendant. He was tried on a count charging him with the first degree murder of Martha Jane Chisenall, found guilty, and sentenced to death. On appeal, this Court affirmed that judgment on October 6, 1966. Beecher v. State, 280 Ala. 283, 193 So.2d 505.
Thereafter, defendant filed in the Supreme Court of the United States a petition for certiorari to review the opinion and judgment rendered by this Court. The Supreme Court of the United States granted certiorari and on October 23, 1967 reversed the decision of this Court. Beecher v. Alabama, 389 U.S. 35, 88 S.Ct. 189, 19 L.Ed.2d 35.
On January 18, 1968, defendant was again indicted by the Grand Jury of Jackson County, Alabama, for murder in the first degree of Martha Jane Chisenall.
On January 20, 1969, the Circuit Court of Jackson County, Alabama, heard testimony on the defendant's Motion for Change of Venue. The transcript of the evidence taken at said hearing indicates that the State, either before or at the time of the hearing, nolle prossed the original indictment pending against the defendant. At the conclusion of the hearing, the court granted the Motion for Change of Venue, changing the situs of the trial to Cherokee County, Alabama, and scheduling arraignment for January 22, 1969, in the Circuit Court of Cherokee County, Alabama. Defendant was duly arraigned at the appointed time on the indictment of January 18, 1968, and entered pleas of "Not Guilty" and "Not Guilty by Reason of Insanity." Trial of the cause was set for February 4, 1969.
On February 4, 1969, immediately prior to the commencement of trial, the defendant filed motions seeking to have the court permit the examination of jurors individually, in groups of six, and in groups of twelve, respectively, outside the presence of the other jurors. The lower court granted the motion to examine the jurors individually, but not outside the presence of the other jurors; overruled the motion to examine the jurors in groups of six; and granted the motion to examine the jurors in groups of twelve.
At the conclusion of the trial of the cause on February 5, 1969, the jury returned a verdict of guilty and imposed the death penalty. Judgment and sentence on the same date were in accord with the verdict of the jury.
This appeal is perfected under the provisions of the automatic appeal statute applicable in cases where the death penalty is imposed. Section 382(1) et seq., Title 15, Recompiled Code 1958; Act No. 249, Gen. Acts 1943, p. 217.
The defendant was represented in the trial below by three court appointed attorneys. He is represented on this appeal by one of the same attorneys, as well as by an additional attorney who did not participate in the trial. All attorneys involved in the trial and this appeal were appointed by the trial court.
*158 The defendant's contention in brief complains of alleged error on the part of the trial court in admitting into evidence the testimony of Dr. William L. Headrick, Jr., the physician who treated the defendant shortly after his apprehension in Tennessee, concerning inculpatory statements allegedly given by the defendant to Dr. Headrick at the time of said treatment. The defendant argues that the alleged confession was inadmissible because "* * * (1) the confession was given involuntarily; (2) the confession was given while the defendant was in the custody of the police or otherwise deprived of his freedom by the authorities and was subjected to questioning without being advised of his constitutional rights as provided for in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and later United States Supreme Court cases."
The rule is well-established that extrajudicial confessions are prima facie involuntary and inadmissible and the duty rests in the first instance on the trial judge to determine whether or not a confession is voluntary, and unless it so appears, it should not be admitted. Duncan v. State, 278 Ala. 145, 176 So.2d 840; and cases therein cited.
A confession is involuntary unless it is "the product of a rational intellect and a free will." Blackburn v. State of Alabama, (1960) 361 U.S. 199, 208, 80 S.Ct. 274, 280, 4 L.Ed.2d 242; Davis v. State of North Carolina, (1966) 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895. It is not the product of a rational intellect and a free will if the petitioner's will to resist confessing is overborne. Rogers v. Richmond, (1961) 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760. An accused's will can be overborne by pressures engendered by physical or psychological coercion (Rogers v. Richmond, supra) or insanity (Blackburn v. Alabama, supra). These principles were reiterated in the case of Townsend v. Sain, (1960) 372 U.S. 293, 307, 83 S.Ct. 745, 754, 9 L.Ed.2d 770, wherein the Supreme Court of the United States stated the following:
"Numerous decisions of this Court have established the standards governing the admissibility of confessions into evidence. If an individual's `will was overborne' or if his confession was not `the product of a rational intellect and a free will,' his confession is inadmissible because coerced. These standards are applicable whether a confession is the product of physical intimidation or psychological pressure and, of course, are equally applicable to a drug-induced statement. * * *"
Notwithstanding these comments by the United States Supreme Court, we understand its holding in Townsend v. Sain, supra, to be limited to two propositions: Did Townsend's petition for habeas corpus allege a deprivation of his constitutional rights? Was the District Court required to hold an evidentiary hearing to determine these constitutional questions? Both questions were answered in the affirmative by the court.[1] and [2] It did not establish any novel standard relating to the admissibility of confessions.
Townsend's petition was based upon allegations: that at the police station he became ill from the withdrawal of narcotics and was administered scopolamine (hyoscine) and phenobarbital, combined, by a police physician; that the drug scopolamine has the properties of a "truth serum," and that the injection produces a physiological and psychological condition adversely affecting the mind and will; that this state removes one from reality, one is not able to see or feel properly, one loses one's ability to withstand interrogation, and produces a physiological and *159 psychological state susceptible to interrogation resulting in confessions; and that the injection in this case caused him to confess. Townsend also alleged the police doctor willfully suppressed this information and the identity of hyoscine and scopolamine. The respondents admitted that Townsend was entitled to relief if the allegations of his petition are taken to be true.
In the course of its opinion the Supreme Court, in Townsend, simply reiterated heretofore established standards governing the admissibility of confessions into evidence stating that if one's "will was overborne" or if one's confession was not "the product of a rational intellect and a free will," one's confession is coerced and inadmissible. The opinion then concluded that these standards are as likewise applicable "whether a confession is the product of physical intimidation or psychological pressure and, of course, are equally applicable to a druginduced statement." (372 U.S. at page 307, 83 S.Ct. at page 754.)
Nevertheless, we do not see that the court, in its holding, has articulated any new, different, or unique standards relating to confessions except to say existing standards apply to drug-induced statements. So, we must judge the confession in the instant case by the existing standards of voluntariness.
This brings us to a consideration as to whether the statement Beecher made to Dr. Headrick meets these standards of voluntariness.
A hearing was conducted outside the presence of the jury on the question of the voluntariness of the confession given by defendant to Dr. Headrick at the South Pittsburg, Tennessee, hospital in accordance with Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908. During the course of such hearing Dr. Headrick testified as follows:
"Q. I will ask you if you saw Johnny Daniel Beecher on June 17, 1964?
"A. Yes, sir, I did.
"Q. And where did you see him?
"A. In the emergency room at South Pittsburg Municipal hospital.
"Q. What time of day did you see him?
"A. About 4:45 A.M. on 6/17/64.
* * * * * *
"Q. Doctor, how long did he stay in your office or in the treatment room there?
"A. I am not exactly sure, but I would guess maybe an hour to an hour and a half.
"Q. I will ask you if he made a statement to you at that time?
"A. Well, we talked.
"Q. All right.
"A. Yes, sir, we talked.
"Q. Did you ask him any questions about the crime or what all he had done or did he just make a voluntary statement to you?
"A. I am not exactly sure if I asked him specific questions but he told me quite a bit about it.
* * * * * *
"Q. Now, you didn't make any threats or offer him any promises of award (sic) or immunity if he would make a statement to you, did you?
"A. No, sir.
"Q. What did he say to you at that time?
"A. Well, I guess originally he started off telling me about his life, that his mother had died when he was growing very young and his father left the family and he had had a rough time all of his life and he had to dig in the ground for roots for food and steal and he got in trouble and what not to exist.

*160 "Q. What if anything did he say about seeing Martha Jane Chisenall, the woman that was raped and killed?
"A. Well, he told me he had seen her up on her front porch several times and he had made up his mind no matter what the cost he was going to have some of that. He also told me he raped her three times. He didn't mean to kill her but the people were coming up the mountain waiting forhunting for him and she wouldn't be quiet and he had to kill her
"MR. ARMSTRONG: We move the answer be stricken, Your Honor.
"MR. BLACK: The jury is not here.
"THE COURT: How much morphine did you give him?
"A. I gave him a quarter of a grain intraveneously (sic) and a quarter of a grain muscularly.
"THE COURT: How did that act on him?
"A. Relieved his pain. That is an
"THE COURT: What affect (sic) would it have on his mental capacity?
"A. Well, morphine will relieve pain and make a patient have a sense of well-being. It doesn'tunless you get a tremendous overdose where it supresses (sic) respiration or makes them unconscious
"THE COURT: This particular case, in your opinion, did he know what he was talking about?
"A. Yes, sir.
"THE COURT: And know the meaning of it?
"A. Yes, sir.
"THE COURT: Realized it?
"A. This dosage was not even big enough to completely relieve all of his pain.
"THE COURT: All right. Go ahead."
At this hearing on the voluntariness of this confession (outside of the presence of the jury) the defendant testified that he remembered nothing after the doctor gave him a shot, that the effect of the morphine put him at ease; "it kinda made me feel like I wanted to love somebody; took the pain away; made me feel relaxed"; and, that the morphine did not make him unconscious, stating morphine doesn't make you unconscious. He further testified that he doesn't know if he acted normal or not, since he did not remember talking with the doctor after the shots, and that his mind was a blank after the shot.
Dr. Headrick also testified that the dosage of morphine administered was not enough to alleviate all of defendant's pain, stating he still had pain when they tried to move him; that he was trying to make him comfortable and to relieve his pain.
Dr. Headrick, after the lower court ruled that the confession was admissible, and during the presentation of his testimony to the jury, testified that the morphine would not affect Beecher's mental capacity in any way, unless he became unconscious, stating if he had an overdose, respiration would be affected and he would be unconscious. The doctor testified that he did not give him an overdose and Beecher did not become unconscious.
This is no station house interrogation by police officers as was the case in Townsend, supra. In fact, it is not clearly established that the doctor even questioned defendant. In one instance, the doctor related: "I am not exactly sure if I asked him specific questions but he told me quite a bit about it. "In another place, the doctor indicated: "I think I asked him why he did it." All this was in the course of treatment of the gunshot wound in the presence only of defendant, the doctor and his nurse,[3] and, *161 after the doctor had also given him food, water and cigarettes. Further the doctor stated he had made no arrangements with the authorities to question defendant.[4]
It seems to us that this case bears little factual resemblance to Townsend v. Sain, supra, where a truth serum was allegedly injected into a defendant at the station house by a police surgeon before questioning by police officers.
In Townsend v. Sain, supra, the drug administered to Townsend was shown to have been a combined dosage of 1/8 grain of phenobarbital and 1/230 grain of hyoscine. It was alleged that it had not been disclosed that hyoscine is the same as scopolamine or that the latter is familiarly known as "truth serum." On appeal in that case the Supreme Court of the United States stated:
"* * * It is difficult to imagine a situation in which a confession would be less the product of a free intellect, less voluntary, than when brought about by a drug having the effect of a `truth serum.' * * *" [Emphasis supplied] (372 U.S. at 307-308, 83 S.Ct. at 754.)
The defendant has made no allegation nor presented any evidence in the case under review tending to classify morphine as a "truth serum," nor tending to show that morphine produces the same effects as a "truth serum." Further, Dr. Headrick testified extensively, in answer to questions propounded by counsel and the court, as to the dosage, mode of administration, and effects of morphine on this defendant. There is nothing in the record that satisfies this court that the administering of morphine in this case either overbore "defendant's will" or that his confession was not "the product of a rational intellect and a free will."
*162 We are of the opinion that the able trial judge correctly ruled that the confession given by the defendant to Dr. Headrick in the emergency room, considered independently, meets the test of voluntariness subscribed to in this State, as well as that proscribed by Federal constitutional provisions.
The defendant further argues that the confession given to Dr. Headrick was involuntary and inadmissible in evidence, based on what the Supreme Court of the United States said in Beecher v. Alabama, supra, relative to confessions allegedly given by the defendant before and after the confession in question. The defendant argues: that the Supreme Court of the United States held the confession allegedly given by the defendant, at the time of his apprehension by Tennessee police officers, was a product of "gross coercion"; that the confession given some five days later in Kilby Prison hospital to State investigators was also involuntary because there was "no break in the stream of events"[5] from the time of the first alleged confession until the confession at Kilby Prison; that therefore the confession allegedly made to Dr. Headrick, in the interim and within an hour after the defendant's apprehension in Tennessee, was made at a time when there was also "no break in the stream of events," and was therefore involuntary and inadmissible.
During the first trial of this cause, the State introduced evidence tending to show that the confession given by the defendant to State investigators in Kilby Prison hospital was voluntary. No refutative evidence was offered by the defendant. The trial court found the confession to be voluntary. It was only on the hearing on the motion for a new trial that the defendant testified as to coercive acts of the arresting Tennessee police officers at the time of his apprehension and alleged first confession. The State offered no evidence on the hearing of the motion for a new trial to refute the defendant's contentions. In that state of the record, the Supreme Court of the United States rendered its decision in Beecher v. Alabama, supra, based on what that court referred to as "uncontradicted facts" pertaining to "gross coercion" (in the words of that court) at the time of arrest. In that opinion the court found the admission of the confession at Kilby Prison required a reversal.
In the trial from which this appeal is perfected, the lower court heard testimony, outside the presence of the jury, presented by the State tending to show the voluntary nature of the confession allegedly given by the defendant to Tennessee authorities at the time of his arrest. This evidence showed that after Beecher was shot, he told Chief of Police Dick Burroughs of South Pittsburg, Tennessee, his name was Johnny Beecher and he was the man they were hunting in Alabama.
The defendant thereafter took the stand (outside the presence of the jury) to testify as to the circumstances attendant to his apprehension and alleged confessions. His testimony was essentially similar to that given at the hearing on motion for a new trial. The defendant contended that he was shot in the leg; that he fell to the ground; that the Chief of Police came up with a gun in his hand and asked, "Why did you kill that white woman?"; that the Police Chief placed the pistol on his nose; that another law officer fired a rifle by the side of his ear; that he then admitted raping and killing Mrs. Chisenall.
Police Chief Dick Burroughs, South Pittsburg, Tennessee, generally refuted the defendant's version of the circumstances surrounding his confession. He denied asking defendant why he killed the white woman. The police chief said the other officer did fire the rifle but only to signal the defendant's capture. Although he was not sure about the position of the rifle, Beecher was more than two or three feet *163 away when the rifle was fired; and the rifle was "not down right at the head of the defendant." He also denied making any threats to the appellant. Chief Burroughs testified he did not put a pistol on defendant's nose, nor did anyone else.
The State did not offer this confession in evidence, but the trial judge did admit the confession to Dr. Headrick. Prior to the trial judge's ruling allowing the Dr. Headrick confession to go to the jury, defense attorneys assigned the "no break in the stream of events" contention as an objection. From the record it is clear that the trial judge considered this contention. The "no break in the stream of events" contention was buttressed by so-called "uncontradicted" facts in the first trial, but in this trial this was not true. This court holds that the "no break in the stream of events" contention in this instance is without merit.
The defendant's second major contention is that the confession allegedly made to Dr. Headrick was inadmissible for failure of the authorities to comply with the requirements of Miranda v. Arizona, supra.
What this court said in Truex v. State, 282 Ala. 191, 210 So.2d 424, wherein the defendant had made an inculpatory statement to a Mrs. Kendrick without the benefit of the so-called Miranda warnings, is dispositive of the defendant's contentions herein:
"The objection to this testimony rests in the contention that Mrs. Kendrick failed to apprise the defendant of his constitutional right to remain silent. We are constrained to agree with the Supreme Court of Nevada that the substance of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) and Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) have no application when confessions or admissions otherwise admissible are given to persons who are not officers of the law nor their agents. Schaumberg v. State, 83 Nev. 372, 432 P.2d 500 (1967)."
See also Anno.: "What Constitutes `Custodial Interrogation' Within Rule of Miranda v. Arizona Requiring That Suspect Be Informed of His Federal Constitutional Rights Before Custodial Interrogation," 31 A.L.R.3d 565, and particularly the cases under Section 26 entitled, "Doctors or Nurses," starting on page 669.
In response to the defendant's Motion for Change of Venue, the lower court, after a hearing on the motion in open court, granted said motion, changing the situs of the trial from Jackson County to Cherokee County, Alabama. The defendant, in the assignment of error, contends that the failure of the lower court to grant the change of venue to a more remote county constituted error prejudical to the defendant.
On an application for a change of venue, and on granting the motion for removal, the trial court must decide what is the nearest county free from objection. Section 267, Title 15, Recompiled Code 1958; Patterson v. State, 234 Ala. 342, 175 So. 371, cert. den. Patterson v. State of Alabama, 302 U.S. 733, 58 S.Ct. 121, 82 L.Ed. 567.
The lower court conducted an extensive examination of numerous witnesses in seeking to determine if the defendant could obtain a trial in Jackson County, Alabama, free from prejudice. In its examination, the lower court heard evidence not only as to any prejudice existing in Jackson County, but also as to prejudicial effects, if any, in nearby counties to which radio, television and newspaper coverage extended. The mere fact that such publicity has been dispersed does not, in itself, mean that a defendant cannot get a fair trial. Mathis v. State, 283 Ala. 308, 216 So.2d 286, reversed as to death sentence on other grounds and remanded to Supreme Court of Alabama for further proceedings, 403 U.S. 946, 91 S.Ct. 2278, 29 L.Ed.2d 855. Mrs. Chisenall met her death *164 on June 15, 1964. The order moving the trial to Cherokee County, which is not an adjoining county to Jackson County, was dated January 20, 1969. We are of the opinion that the lower court did not abuse its discretion in granting the change of venue from Jackson County to Cherokee County, Alabama.
During the course of the trial, three black and white photographs were introduced into evidence by the State. The photographs depicted the deceased's body as first discovered, on a stretcher after removal from the shallow grave, and in the coroner's office, respectively. Each of the photographs met the test of having some tendency to prove or disprove a disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered, and was not improper. Baldwin v. State, 282 Ala. 653, 213 So.2d 819.
The lower court permitted, over the defendant's objection, the State Toxicologist to testify concerning the condition of the deceased's genital area. Such evidence, in addition to being part of the res gestae, tends to shed light on the acts, motive and intent of the defendant at the time of the offense and was properly admitted. Smarr v. State, 260 Ala. 30, 68 So.2d 6; Garner v. State, 269 Ala. 531, 114 So.2d 385.
The defendant's contention that the statements made to Dr. Headrick and related by the latter in his testimony are privileged is without merit. As communications to physician or surgeon by a patient or one seeking professional advice are not privileged under common law, no such privilege exists in Alabama, in the absence of a statute creating it. Dyer v. State, 241 Ala. 679, 4 So.2d 311. There is no such statute in Alabama.
The lower court overruled the defendant's motions to examine the jurors individually and in groups of twelve respectively, outside the presence of the other jurors. This was without error. Jurors may be qualified on voir dire in groups at the discretion of the court. Seals v. State, 282 Ala. 586, 213 So.2d 645; Aaron v. State, 273 Ala. 337, 139 So.2d 309, cert. den. 371 U.S. 846, 83 S.Ct. 81, 9 L.Ed.2d 82. The defendant was not entitled to examine each prospective juror outside the presence of the other jurors. Seals v. State, supra.
The defendant assigns as error his removal from Tennessee to Alabama without first having been taken before a magistrate in Tennessee and without having signed a waiver of extradition as required by law. The transcript of the evidence shows that the defendant did sign a waiver of extradition prior to being removed from the State of Tennessee. Further, the testimony of Dr. Headrick tends to show that, at the time the defendant signed the waiver of extradition, his (the defendant's) mental faculties were in no sense impaired to the extent that he was not cognizant of what he was doing. We fail to find any infringement of the defendant's constitutional rights, State or Federal, in the procedure followed relative to his removal from Tennessee to this State shortly after his apprehension.
Mindful of our duty in cases where the death penalty is imposed, we have reviewed the entire record thoroughly for error, whether assigned or not. We have commented herein on most of the numerous assignments of error set forth by the defendant. The others we find to be palpably without merit and pretermit any discussion thereof.
A majority of the justices concur in the above opinion, namely, SIMPSON, MERRILL, COLEMAN, HARWOOD, BLOODWORTH, MADDOX and McCALL, JJ.
HEFLIN, C. J., and LAWSON, J., dissent.
However, a majority of the Justices are of the view that because of the impact of *165 recent decisions of the Supreme Court of the United States, this case must be remanded to the lower court for further proceedings as herein set forth. Chief Justice Heflin and Justice Lawson concur in the view that this case must be remanded, though adhering to their conclusions that this judgment should be reversed, their conclusions in this regard being set forth in the dissenting opinion of Chief Justice Heflin.
We note that the record does not contain a transcript of the proceedings when the jury venire was qualified. Therefore, we are unable to determine whether the jury which convicted Beecher was constitutionally selected. The appellant does not discuss in brief on appeal any infirmity in the jury qualifying process.
Previously, this court would not normally review the question of the qualifications of the jurors unless an objection was made to the procedure, or unless an allegation was made in a post-conviction proceedings that the procedure was constitutionally irregular and prejudicial, making the imposition of the death penalty impermissible.
In Mathis v. Alabama, 403 U.S. 946, 91 S.Ct. 2278, 29 L.Ed.2d 855, Mathis had been convicted and sentenced to death. His conviction was reviewed by this court and affirmed (280 Ala. 16, 189 So.2d 564 (1966)). The Supreme Court of the United States denied certiorari (386 U.S. 935, 87 S.Ct. 963, 17 L.Ed.2d 807). Mathis thereafter filed a petition for Writ of Error Coram Nobis in the Circuit Court of Coffee County, and although he alleged several grounds of error with regard to the selection of the trial jury, he made no claim of error with regard to the qualification of the jury pertaining to their opinions as to capital punishment. This court affirmed the trial court's denial of Mathis' Writ of Error Coram Nobis (283 Ala. 308, 216 So.2d 286 1968)). Mathis then filed a petition for certiorari to the Supreme Court of the United States wherein he claimed for the first time that the jury venire was not qualified properly and in accordance with the requirements of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776. The Supreme Court of the United States granted the Writ and reversed the judgment insofar as it imposed the death sentence. 403 U.S. 946, 91 S.Ct. 2278, 29 L.Ed. 2d 855. Only a memorandum opinion was issued by the United States Supreme Court, citing Witherspoon, supra; Maxwell v. Bishop, 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed. 2d 221; Boulden v. Holman, Warden, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433.
In accordance with the mandate of the Supreme Court of the United States, this court remanded the cause to the lower court with instructions to conduct a hearing to determine whether or not those jurors who had stated that they had "fixed opinions" against capital punishment could nevertheless consider the evidence and instructions of the court and return a verdict of guilty although that verdict could result in a death penalty.
As we interpret the action of the Supreme Court of the United States in Mathis, supra, it would appear that implicit therein is that the constitutional validity of a jury imposing the death penalty can be raised for the first time in a petition for certiorari to the Supreme Court of the United States.
Both the original trial record and the record on appeal of the Writ of Error Coram Nobis in the Mathis case were silent as to whether jurors may have been excused because of their opinion about capital punishment. The record in this case, as before stated, is likewise so silent. Therefore, we find ourselves in the position of being aware that the Supreme Court of the United States will not permit the imposition of the death sentence unless an affirmative showing is made in the record that the requirements of Witherspoon have been met. This court has already recognized that in view of the Witherspoon doctrine, trial courts should make certain *166 in capital cases that the court reporter takes full notes from which a transcription can be made of the examination of prospective trial jurors, (Liddell v. State, 287 Ala. 299, 251 So.2d 601, decided August 5, 1971). It would undoubtedly prove futile if at this time we should not notice the absence in this record of an affirmative showing that the jury was properly qualified under Witherspoon as to their opinions in regard to imposing a death sentence.
We conclude that we should not order the sentence of death to be executed until we are satisfied that the jury which imposed the sentence of death was properly and constitutionally selected.
Accordingly, this case is remanded to the Circuit Court of Cherokee County with instructions that a hearing be conducted with the appellant and his attorneys present, and that the court determine first whether any jurors were challenged because of their affirmative answers to a general question as to a fixed opinion against capital punishment, and that if any such jurors were so challenged because of their affirmative answers to a general question as to a fixed opinion about capital punishment, that such jurors be summoned and examined.
This examination of any challenged jurors should be directed toward determining whether or not the challenged jurors would have, in view of their affirmative answers as to having fixed opinions against capital punishment, nevertheless consider the evidence and instructions of the court and return a verdict of guilty although that verdict could result in a death penalty, if they, being the triers of fact were convinced of the guilt of the accused, and that the facts warranted a sentence of death.
The court is further instructed that this hearing be conducted as speedily as is feasible, that a full record be made thereof, a transcript of such record be made, together with the court's conclusions from the evidence adduced, and that a transcript of these proceedings under the seal of the clerk be promptly forwarded to this court.
The prisoner will remain in custody until discharged by the due process of law.
Affirmed conditionally and remanded for further proceedings.
HEFLIN, C. J., and LAWSON, SIMPSON, HARWOOD, and MADDOX, JJ., concur in the remandment of this case.
MERRILL, COLEMAN, BLOODWORTH and McCALL, JJ., would affirm without remandment.
HEFLIN, Chief Justice (dissenting):
I must respectfully dissent from the portion of the majority opinion concerning the admissibility of the confession. The defendant was given ¼ of a grain of morphine intravenously (directly into the bloodstream) and ¼ of a grain intramuscularly before he confessed. He was in a great deal of pain when he arrived at the hospital. The doctor testified that his leg was nearly shot off. It is obvious from evidence that Mr. Beecher was in a serious physical condition and under the influence of morphine when the confession was given.
I differ with the majority opinion in its interpretation of the holding in Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed. 2d 770. In my opinion this case extends to narcotic affected confessions the principle that a confession is involuntary unless it is "the product of a rational intellect and a free will" (Blackburn v. State of Alabama, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242). While Townsend v. Sain, supra, may not articulate a new, different and novel standard, it helps to clarify an area of confused thinking pertaining to the admissibility of confessions when narcotics are involved. In very clear language it holds that the requisite voluntariness of a confession is not established if the evidence only satisfies the "coherency" standard. *167 The fact that the defendant was mentally coherent at the time he confessed is not sufficient. As I interpret this case not only must mental coherency be established but all aspects of narcotic influence must be considered before a confession is accepted as the "product of a rational intellect and a free will".
At first glance, one could be misled by the opinion in Townsend v. Sain, supra, to believe the only reason the Supreme Court of the United States remanded the cause for an evidentiary hearing in the habeas corpus proceeding was because of the possibility that the "truth serum" had been used to procure the confession. However, there were other reasons for the requirement of such evidentiary hearing on remandment, one of which was that the record in and the opinion of the Illinois Supreme Court in People v. Townsend, 11 Ill.2d 30, 141 N.E.2d 729, 69 A.L.R.2d 371 (the direct appeal State opinion involved in Townsend v. Sain, supra) did not reveal indicia that the Illinois courts applied the proper standard of federal law in ruling upon the admissibility of the confession in that case.
In reviewing the evidence in the instant case in its most favorable light for the State, it merely showed that the defendant knew what he was talking about; knew the meaning of what he said; realized what he was saying; and the morphine did not affect his mental capacity. In comparing this with the evidence in People v. Townsend, supra, the conclusion is inescapable that the evidence was far stronger for the establishment of a prima facie case of voluntariness in that case than in the instant case. The following summary of the evidence concerning the influence of drugs appears in People v. Townsend, supra:

"* * * The medical evidence is, however, that defendant's use of drugs would not have caused an impairment of his mental processes or rendered him incapable of knowing the purpose and consequences of a confession. Likewise the psychiatric evidence relative to defendant's low intelligence quotient was that he was sane and thus capable of distinguishing between right and wrong. With these factors eliminated, the resolution of whether defendant possessed the requisite mental powers and freedom at the time he confessed must depend upon a determination of whether the injection of phenobarbital and hyoscine given to treat his illness had the effect of then depriving him of his faculties.
"When defendant testified during the inquiry into his confession, he maintained that, prior to the injection, he had consistently denied any knowledge of Boone's death. However, within a few minutes after the injection, according to defendant, his vision became blurred, his memory failed him, he could hear people talk but could not understand or recognize them, he answered questions without knowing why, he couldn't hold his head up, and his only sensation was that he wanted to sleep. He professed not to have any recollection of giving a statement to the assistant State's Attorney and, while he recalled going to the latter's office and signing some papers on the day following the injection, he testified his mental confusion continued to a degree that he did not know what he was signing.
"To support the defendant's testimony, and to rebut intervening evidence given by the police surgeon, the defense called Charles Proctor who qualified as an expert pharmacologist and toxicologist with extensive experience as a teacher and a chemist. In answer to a hypothetical question which encompassed all the facts relating to defendant's habits and the circumstances of his confession, this witness expressed the opinion that the injection given would have caused defendant to suffer from drowsiness and apathy on one extreme, to complete disorientation and excitation on the other. When commenting upon the properties of hyoscine the witness stated that further effects, from the manner in which it was *168 employed here, would be an impairment of vision and the loss of memory for occurrences during the period the drug remained active in the body. This period, he estimated, would commence 10 to 15 minutes after injection and would last for a period of five to eight hours. When cross-examined he revealed he had never actually seen the effects of hyoscine on a human and admitted that he was unfamiliar with its use in treating drug addicts.
"In almost direct contradiction to Proctor's testimony, the police surgeon, who stated that the medication was given to relieve and pacify the defendant, testified it would not cause a person to go to sleep, would not impair the eyesight, would not cause a loss of memory and would not cause an impairment of mental condition. Nor would such results occur, he stated, even though defendant had actually taken the four phenobarbital pills immediately after the injection. These opinions of the surgeon, it appears, were based on 14 years experience with narcotic addicts, during which he had treated some 3,000 cases of withdrawal reactions in the same manner as he had the defendant. On cross-examination, while admitting that excessive or prolonged use of phenobarbital or hyoscine could cause different results, he remained firm in his opinion that the dosage given defendant would have none of the effects related in the latter's testimony. Corroborating the testimony of the surgeon was that of the officers present, and the assistant State's Attorney, to the effect that defendant was not sleepy or drowsy after the injection, that he had no apparent difficulty with his eyesight, and that he answered questions put to him clearly and coherently.

"On the basis of the evidence set forth, the trial court found the confession was voluntarily made and denied defendant's motion that it be suppressed as evidence. This decision of the court is now assigned as error." (Emphasis supplied)
The Supreme Court of the United States in Townsend v. Sain, supra, was not convinced that the proper federal standard of voluntariness was satisfied by expert testimony that the drugs would not cause "an impairment of mental condition", or "that defendant's use of drugs would not have caused an impairment of his mental processes." Likewise, it is obvious that the proper federal standard of voluntariness cannot be satisfied from the testimony of Dr. Headrick. It must be concluded that expert testimony to the effect that a drug did not cause an impairment of the mental process or have any effect on mental capacity merely goes to establish "coherency" and there must be further evidence that the confession was the product of a rational intellect and a free will in all aspects before it is admissible.
Testimony directed towards the effect of narcotics in connection with resistance to confessing or willingness to confess is essential. The words of Justice Goldberg in his concurring opinion in Townsend v. Sain, supra, aid in explaining the type of proof required:
"The petitioner may have been fully aware of what he was doing in confessing and may have suffered no loss of memory, but that is not the issue. The crucial question, and the measure of evidentiary propriety under the Constitution, is whether the drugwhatever label was or was not affixed to it so overbore the petitioner's will that he was unable to resist confessing. Whether or not he was conscious of what he was doing, the petitioner could, because of the drug, have been wholly unable to stop himself from admitting guilt."
The following language of Justice Frankfurter in Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 was helpful to a federal district court in reaching its decision in Logner v. State of North Carolina, 260 F.Supp. 970, where a druginfected confession was involved:
"No single litmus paper test for constitutionally impermissible interrogation *169 has been evolved * * * [t]he ultimate test remains * * * the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. Rogers v. Richmond, 365 U.S. 534, 81 S. Ct. 735, 5 L.Ed.2d 760. The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession."
Explaining a portion of the holding in Townsend v. Sain, supra, the Supreme Court of California, speaking through the language of Chief Justice Traynor in In Re Cameron, 68 Cal.2d 487, 67 Cal.Rptr. 529, 535, 439 P.2d 633, 639, stated:
"* * * An accused's will can be overborne * * * by the influence of a drug * * * that impairs his ability to exercise his rational intellect and free will. If an accused's will is overborne because of impairment of his ability to exercise his rational intellect and free will, it is immaterial whether that impairment was caused by the police, third persons, the accused himself, or circumstances beyond anyone's control. * *" (Emphasis supplied)
In connection with the matter of drugs, mental conditions, states of mind, confessions and other related matters, see article by Leon M. Despres entitled, Legal Aspects of Drug-Induced Statements, 14 U. of Chicago L.Rev. 601; article styled Medication As A Threat To Testamentary Capacity by David J. Sharpe, 35 N.Carolina L.Rev. 380; and article captioned Intoxicated Confessions: A New Haven in Miranda? by Ozro William Childs IV, 20 Stanford L. Rev. 1269. See also Annotation: "Use or Administration of Drugs or Narcotics as Affecting Admissibility of Confession", 69 A.L.R.2d 384. However, it must be realized that many state cases cited therein have been indirectly overruled by Townsend v. Sain, supra.
In analyzing the standard that must be followed by federal and state courts alike, pertaining to narcotic-affected confessions, it is necessary that not only must there be sufficient proof that defendant possessed a "coherent" mental condition at the time of confessing, but the state must also establish that the confession was "the product of a rational intellect and a free will" (Blackburn v. Alabama, supra), or stated another way, in the language of Justice Frankfurter in Culombe v. Connecticut, supra, "the product of an essentially free and unconstrained choice of its maker", by evidence which shows that the defendant's will to resist confessing was not overborne. Rogers v. Richmond, 365 U.S. 534, 81 S. Ct. 735, 5 L.Ed.2d 760.
These standards are stated in broad general terms, for each confessionary act must be judged on its own peculiar set of circumstances. When narcotics are involved the following may have relevance: euphoria (a feeling of well-being or elation), loss of anxiety, loss of inhibitions, loss of resistance to free expression, etc. On the other hand, willingness to confess may be controlled by other tendencies, unrelated and unaffected by the narcotic. Many individuals are motivated by religious backgrounds or remorseful attitudes which militate toward free expression following unusual stressful experiences. The motivation to purge one's soul of an awesome conscience-hurting experience often compels a confession. Certainly inquiries before the trial judge should include the following which are listed numerically but without intended priority:
1. Dosage of the narcotic (whether normal, less than normal, or more than normal) and its effects upon individuals.
2. The time it takes for the narcotic to take effect and the time relationship *170 of the inculpatory statement and the effect of the drug.
3. If the influence of the narcotic is established, then it should be determined whether the drug created in the defendant a state of mind causing one or more of the following:
(a) Euphoria;
(b) Loss of inhibitions;
(c) Loss of anxiety;
(d) Loss of resistance to free expression, particularly concerning participation in a crime;
(e) A susceptibility to suggestions and/or interrogation;
4. If such narcotic did create in the defendant's state of mind one or more conditions listed above under "3.", was such condition of such significance as to cause his will to be overborne.
5. Did the defendant possess on the occasion tendencies or motivations unrelated to a drug, which compelled the confession.
While the above list of inquiries is certainly not comprehensive, I hope that, nevertheless, they provide some insight to the problems in this area. I am of the opinion that a trial judge must look to all relevant factors, whether attendant to the influence of the drug or not, and give due consideration and weight to such in reaching his determination of the involuntariness or voluntariness of any alleged confession, bearing in mind that the burden of proof is on the State.
Possibly the majority opinion may be understood as holding that the drug aspect of Townsend v. Sain, supra, applies only to a "truth serum" drug. If so, such would be clearly erroneous. In reversing the first appeal case pertaining to a confession allegedly made by the defendant Beecher in Kilby Prison some five days after his arrest in Tennessee while being interrogated by State investigators following an injection of morphine, the Supreme Court of the United States stated, among other things, in Beecher v. Alabama, 389 U.S. 35, 89 S.Ct. 189, 19 L.Ed.2d 35 that at the time of the alleged confession Beecher was still in pain, "under the influence of drugs" and at the complete mercy of the prison hospital authorities. There can be no doubt that the fact that Mr. Beecher was under the influence of morphine[1] at the time he confessed was one of the factors considered in that review in determining said confession was not characterized by the requisite voluntariness.
I further disagree with the majority opinion since it wrongfully places the burden of proof on the defendant. The entire treatment by the majority in its opinion of the admissibility of the drug-infected confession as well as specific portions thereof compels me to this conclusion.
The law of this State is clear that confessions are presumed to be involuntary or prima facie inadmissible and the burden is on the State to show they are voluntary. In a recent case, Harris v. State, 280 Ala. 468, 470, 195 So.2d 521, 523, this Court stated the following:
"* * * We quote from the old case of Bonner v. State, 55 Ala. 242, wherein the law pertaining to the procedure to be followed in determining the admissibility of a confession is accurately set forth:

*171 `In that jealous care which the law exercises at all times in protection of life and liberty; in the tender regard it pays to human weakness and frailty, it is laid down as one of the cardinal rules of evidence, that confessions of guilt shall not be received against a prisoner, until it is first affirmatively shown that they were made voluntarily. They are prima facie inadmissible, and the onus rests on the prosecution to repel the imputation of undue influence. Any inducement of profit, benefit, or melioration held out; any threat of violence, injury, increased rigor of confinement, or any other menace which can inspire alarm, dread, or the slightest fear, is enough to exclude the confession, as not voluntarily made. The law cannot measure the strength of human fortitude or will to resist importunity, persuasion, or proffered alleviation, on the one hand, or threats, no matter how slight, on the other. Hence, to justify their admission, confessions must be voluntary in fact.
`And the question, whether confessions were voluntarily made or not, is one of law, to be decided by the court, and not one of fact for decision by the jury. When such testimony is offered, preliminary proof should first be made, showing the circumstances under which the alleged confession was made; and when desired by either party, the court, before admitting the evidence, should hear the testimony offered on each side, and from it determine whether the testimony establishes the fact that the confession was voluntarily made. * * *' See also Duncan v. State, 278 Ala. 145, 176 So.2d 840; Sanders v. State, 278 Ala. 453, 179 So.2d 35; White v. State, 260 Ala. 328, 70 So.2d 624; Logan v. State, 251 Ala. 441, 37 So.2d 753; Taylor v. State, 42 Ala.App. 634, 174 So.2d 795."
Because the confession by the defendant to Dr. Headrick in the case at bar fails to meet the necessary standard of voluntariness as required by this Court's decisions and controlling decisions of the Supreme Court of the United States, as now extended by Townsend v. Sain, supra, to drug-affected confessions, I am of the opinion the case should be reversed.
LAWSON, J., concurs in the foregoing dissenting opinion of HEFLIN, C. J.

After Remandment
PER CURIAM.
In our opinion in this case we concluded that no error infected the trial of this appellant. However, the record was silent as to whether any jurors had been challenged by the state for cause on account of any affirmative answer they may have given to the general question propounded during the qualification of the jurors as to whether any of them had a fixed opinion against capital punishment.
Accordingly, we remanded this cause to the lower court to determine, first, whether any jurors had been challenged on the above mentioned ground, and second, whether in the event a juror had been challenged by the state and excused because of an affirmative answer to the general question, would such juror nevertheless consider the evidence and instructions of the court and return a verdict of guilty although such verdict could result in the death penalty.
This procedure was to determine whether the doctrines enunciated by the United States Supreme Court in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed. 2d 776, and Boulden v. Holman, Warden, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433, had been complied with.
Pursuant to the directions contained in our order of remandment, the lower court, on 21 October 1971, conducted a hearing for the purpose of making the determinations directed in the order of remandment.
The appellant, attended by his counsel, Hon. Morgan Weeks, and Hon. Thomas Armstrong, and Hon. John T. Black, District Attorney for the Ninth Judicial Circuit, and Hon. Bert T. Latham, Assistant *172 District Attorney for said circuit, were present at the hearing.
Mr. Black, being examined as a witness by Mr. Latham, testified that he solely had conducted the prosecution of the appellant at the trial which resulted in the appellant's conviction. Among the questions addressed to the venire by Judge Newton B. Powell, presiding at the trial, in qualifying the jury, was whether any of the jurors had a fixed opinion against capital punishment.
Mr. Black testified unequivocally that not a single juror was challenged by the state for cause, either because of their answers to the question as to their belief in capital punishment, or for any answer to other qualifying questions.
Mr. Weeks and Mr. Armstrong in behalf of the appellant testified to the effect that their notes made in connection with the trial, and which they had with them, indicated that some of the jurors had been challenged, their jury sheets showing a notation "for cause" by certain jurors' names. However, they themselves had challenged some of the jurors for cause because such jurors had asserted a fixed opinion of appellant's guilt, and their notes did not indicate who had imposed the challenges indicated by their notations on the jury sheet. Neither could say that the state had challenged any juror for cause because they could not remember such happening, and everyone was being careful "about Witherspoon" at the time of the trial.
Judge Powell, who presided at appellant's trial, and at the hearing on remandment, stated at the conclusion of the hearing that "the District Attorney advised the trial judge that he would not challenge anyone on the theory that they would not convict if the death penalty was involved. The Witherspoon case was not very old at the time, and there was some question about it, and, * * * the court recalls that no one was challenged because of the capital punishment issue."
At the conclusion of the evidence and after arguments of respective counsel, the court entered a judgment finding, (1) that no juror had been challenged by the State of Alabama for any cause, and (2) that no juror was challenged by the State of Alabama because of a fixed opinion against capital punishment.
The findings by the court are overwhelmingly supported by the evidence. Such facts preclude any possible application or operative influence of the doctrine enunciated in Witherspoon and Boulden, supra.
HEFLIN, C. J., LAWSON, MERRILL, COLEMAN, HARWOOD, BLOODWORTH, MADDOX, and McCALL, JJ., concur in the opinion after remandment.
A majority of the Justices would now affirm the judgment.
Affirmed.
MERRILL, COLEMAN, HARWOOD, BLOODWORTH, MADDOX and McCALL, JJ., concur.
HEFLIN, C. J., and LAWSON, J., dissent as to affirmance and adhere to the views expressed in the opinion of HEFLIN, C. J., on original deliverance.
NOTES
[1] 372 U.S. at page 307, 83 S.Ct. 745. 372 U.S. at page 295, 83 S.Ct. at page 748, in the opening sentence in the opinion Mr. Chief Justice Warren's statement: "This case, in its present posture raising questions as to the right to a plenary hearing in federal habeas corpus * * *" clearly indicates the question before the court was procedural.
[2] 372 U.S. at page 307, 83 S.Ct. 745. 372 U.S. at page 295, 83 S.Ct. at page 748, in the opening sentence in the opinion Mr. Chief Justice Warren's statement: "This case, in its present posture raising questions as to the right to a plenary hearing in federal habeas corpus * * *" clearly indicates the question before the court was procedural.
[3] "Q. I will ask you, doctor, did you administer treatment to him at that time?

"A. Yes, sir.
"Q. What was that?
"A. He had a gunshot wound of the leg and the tibia was shattered and the leg was cleansed and the leg was packed with gauze and he was given a medication for pain and the wound wrapped and strapped so he could be transported.
"Q. What kind of medication did you give him?
"A. Morphine.
* * * * * *
"Q. Was anybody there besides you and your nurse and the defendant?
"A. At one time there was more people in the emergency room but they were cleared from the emergency room and during most of our conversation after the treatment had been accomplished it was just the nurse and Mr. Beecher and I.
"Q. Now, did you also give him some food and water and cigarettes?
"A. Yes, sir."
[4] "THE COURT: Dodid you have any arrangements made with these policemen to get any information?

"A. No, sir.
"THE COURT: For them?
"A. No, sir.
"THE COURT: Did this man volunteer to make this statement to you or was this in response to questions you asked?
"A. I was tryingI would almost like to talk off the record if I may, if it is possible. It doesn't make any difference. I felt sorry for this man. He looked almost like an animal. I was trying in the best way that I could to make him comfortable, of course, to relieve his pain, offer him cigarettes and that sort of thing to make him comfortable. He hadn't eaten in sometimes either. I just stayed in the emergency room and talked to him because he was going to be transferred to Kilby Prison, that was the word that was given to me. I was not to take him to the operating room and to start to work on his leg.
"MR. BLACK: In other words, the statement he gave you was notyou were not probing him?
"A. No, sir, I was not probing him except I will take anybody's history when they come into my office. Of course
"MR. WEEKS: Doctor, I believe you stated whether or not you were not sure whether you asked him specific questions?
"A. I can't remember what my comments were five years ago.
"MR. WEEKS: Then, you could have asked him specifically what questions?
"A. I think I asked him why did he do it. That is what got the thing started as far as concerning
"THE COURT: Is that all you remember you did ask him, why did you do it?
"A. Yes, sir.
"THE COURT: And he told you the whole story then?
"A. He started back in his childhood and telling us the whole story."
[5] See Clewis v. Texas, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967).
[1] It is interesting to note that according to Goodman and Gilman, The Pharmacological Basis of Therapeutics, page 191, inability to concentrate, difficulty in mentation, and apathy are produced by moderate amounts of morphine (up to ¼ of a grain) as well as euphoria, drowsiness, loss of anxiety and inhibition. Further such amounts bring about increased ease of discriminating and making decisions. This note is supplied not as supportive evidence for my dissenting opinion for such information was not in the record, but merely as a passing comment.