**UNITED STATES of America**

v.

**Burton REESE.**

**Crim. No. 72-301.**

United States District Court,
W. D. Pennsylvania.

Dec. 12, 1972.

Jay C. Waldman, Asst. U. S. Atty., Pittsburgh, Pa., for plaintiff.

Sanford A. Middleman, Pittsburgh, Pa., for defendant.

## OPINION AND ORDER

MARSH, Chief Judge.

On June 22, 1972, the First Federal Savings and Loan Association of Pittsburgh was the victim of an armed robbery. The Pittsburgh police investigated the robbery. They supplied bait lists of stolen money to various bonding companies. The next day, Mrs. Brenda Jones was in possession of a $20 bill listed as part of the stolen bait money. Mrs. Jones gave this bill to a bondsman in the Lawyers Building in Pittsburgh in partial payment of a surety bond premium owed by Burton Reese with whom she was living.[1] The $20 bill was "dropped off" by Mrs. Jones in Reese's name.[2]

Burton Reese had been indicted on April 26, 1972 (Criminal No. 72-132) for a previous bank robbery on April 7, 1972, and had been released upon posting the aforementioned surety bond. He subsequently pleaded guilty to that robbery and has been sentenced for study by another judge. Reese is a high school graduate and is a Vietnam veteran. The police knew that Mrs. Jones was going with Burton Reese. The bondsman informed the police that Mrs. Jones had paid part of the balance owing for the bond of Burton Reese with a $20 bill included in the list of stolen bait money, and allegedly gave them an envelope with the $20 bill enclosed, as well as the name of Burton Reese and the address of Mrs. Jones at 122 N. Aiken Avenue.

Armed with this information, 122 N. Aiken Avenue was placed under surveil-

1. Mrs. Jones is separated from her husband but not divorced, and, therefore, is not a common law wife of Mr. Reese.

2. Testimony of Detective Ieraci and Detective Rubonosky, which was not contradicted.

lance until the arrival of a search warrant which authorized a search for certain articles in a third floor apartment at the above address occupied by Lynn Owens.[3] When the search warrant arrived 11 detectives and police officers entered the house and searched the Owens' apartment. In the apartment, among other persons not named, were Mrs. Jones and Burton Reese. The search did not reveal any incriminating evidence. Mrs. Jones and Burton Reese were arrested about 9:00 p. m. and taken to Police Station No. 1 in the Pittsburgh Public Safety Building.[4]

■ I find as a fact that the detectives and police had probable cause to arrest Mrs. Jones and Burton Reese in the Owens' apartment which they entered pursuant to a valid search warrant.

The two suspects were taken to the Public Safety Building in Pittsburgh and interrogated. Mrs. Jones told the police that Reese had given her the $20 bill. The defendant, Reese, knew of his right to call an attorney prior to answering questions, but he never asked to call one. When the defendant was arrested for the bank robbery of April 7, 1972, he retained Attorney Sanford A. Middleman, Esq.; had been advised of his *Miranda* rights on that occasion and made no statements to the police. On June 23rd, he was orally advised of his *Miranda* rights in the Owens' apartment when he was arrested, and later in the police station one of the officers read his *Miranda* rights to him from a written "Pre-Interrogation Warning Form". Reese's affirmative responses were written on this form, and, *inter alia*, he waived his right to have an attorney present. He signed this form. He thoroughly understood his constitutional rights.

Reese knew his attorney would advise him not to make any statements to the police. At the police station, it was made known to Mrs. Jones and Reese that unless he confessed to the bank robbery, Mrs. Jones would be booked as being mixed up in the matter.[5] Mrs. Jones was crying and sobbing during part of the interview; she pleaded with the defendant to tell the truth since he had given her the incriminating $20 bill. Mrs. Jones' 6-year-old child had been left in the custody of an uncle at the apartment.

After discovering that Mrs. Jones had possessed stolen money the day after the robbery, the police were justified in inferring that she knew that the money was stolen and had participated in the theft unless she could explain that her possession was innocent. *United States v. Coppola*, 424 F.2d 991 (2d Cir. 1970); *United States v. Allegrucci*, 299 F.2d 811, 814 (3d Cir. 1962).

■ It was a proper exercise of police investigation to interrogate Mrs.

---

3. The request for a search warrant (Govt. Ex. No. 1) executed by Detective Luke Lesic avers that Brenda Jones " * * * came with money for Marcus Howell and gave her address as 122 N. Aiken Ave. * * *." No explanation was offered by the Government to account for the name Marcus Howell. Detective Lesic was not called as a witness.

4. A complaint executed by affiant, Phares Hutton, a detective attached to the Pittsburgh Robbery Squad was executed on June 24, 1972, before Magistrate Dauer. This complaint alleged that the robbery took place on June 23, 1972. It alleged Reese committed armed robbery, violated the U.F.A. and conspired to commit armed robbery with persons unknown. It specified that the victim was "First Federal of Pgh. Bank", a savings and loan association. No evidence was presented in the affidavit or otherwise showing that Phares Hutton had probable cause to suspect Reese as one of the armed robbers. No arrest warrant was offered in evidence and I find no arrest warrant was issued by the Magistrate. Since Hutton was not called as a witness, no explanation was offered concerning the inconsistent dates or his purpose in executing this complaint.

5. A statement or statements made to this effect attributed to Detective Hutton was not denied by him, although other officer-witnesses who were present testified that they did not hear Hutton make these statements. Cf. *McHenry v. United States*, 308 F.2d 700 (10th Cir. 1962).

Jones and Reese together, for since Mrs. Jones told them she had obtained the bait money from Reese, absent explanation, the inference of criminality also applied to him. The fact that the suspects were told that unless Reese confessed (i. e., explained how he got the stolen money) Mrs. Jones was mixed up in the matter and would be "booked", was, in my opinion, a statement that was logical, proper and the exact truth. I do not regard this statement or the evident implication of the entire situation to be a threat, inducement or promise, but proper and justifiable police procedure. Stein v. New York, 346 U.S. 156, 184, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953). When Jones begged Reese to tell the truth (she did not believe he had committed the robbery), she was, as an unsolicited agent of the police, asking him to explain how he came into possession of the bait money. Of course, if guilty, Reese was under heavy psychological pressure in the presence of the police, but the pressure to confess was not brought about by wrongful police action. I can perceive nothing improper in advising the recently arrested suspects that Mrs. Jones would be "booked" unless Reese, who admitted giving the $20 bill to her, "confessed" where he had obtained possession of it. The alleged coercion stemmed not from the police but from his own awareness of guilt. By this practical method employed by the police, the innocence of Mrs. Jones was established and she was released from custody. Since Mrs. Jones was not the wife or a relative of Reese, the inducement related to a collateral matter; there was no familial pressure that might have rendered the confession involuntary. *Cf*. State v. Beard, 16 N.J. 50, 106 A.2d 265, 296 (N.J.1954); Vogt v. United States, 156 F.2d 308, 312 (5th Cir. 1946); .80 A.L.R.2d, Voluntariness of Confession, pp. 1436–1446. I find as a fact that the defendant's ultimate con-

fession taped within one and a half hours of interrogation [6] was voluntary.

The fact that the search warrant specified Marcus Howell as one possibly seeking to obtain a surety bond does not denigrate the undenied testimony that Mrs. Jones paid a bondsman on account of a bond premium owed by Burton Reese with a recently stolen $20 bill.

 Even if the arrest was unlawful, that does not, *ipso facto*, render inadmissible an admission or confession obtained during illegal detention; the test of admissibility is the voluntary nature of the statement and not the legality of the arrest. Thompson v. Warden, Maryland Penitentiary, 413 F.2d 454 (4th Cir. 1969); Bowlen v. Scafati, 395 F.2d 692 (1st Cir. 1968); Leonard v. United States, 391 F.2d 537 (9th Cir. 1968); Hollingsworth v. United States, 321 F.2d 342, 350 (4th Cir. 1963).

An appropriate order will be entered.

---

6. Most of this time was consumed because Reese feared bodily harm if he disclosed the names of his two confederates, and had to be repeatedly reassured that he need not name them in his confession. This fear was Reese's only reluctance in making his confession.