**UNITED STATES of America**

v.

**George J. STEGMAIER and Delores Pollack.**

**Crim. No. 75–177.**

United States District Court,
E. D. Pennsylvania.

June 6, 1975.

Thomas E. Mellon, Jr., Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Thomas C. Carroll, Public Defender, Philadelphia, Pa., for Stegmaier.

Judith Dean, Philadelphia, Pa., for Pollack.

## OPINION

DITTER, District Judge.

The defendants are charged with offenses growing out of an alleged bank burglary. They have filed motions to suppress, asserting that physical evidence was improperly seized and that the taking of their statements violated constitutional rights. A three day hearing was held during which twelve witnesses testified and numerous exhibits were received in evidence. This opinion will constitute my findings of fact and conclusions as to the disposition of these motions.

Some time during the night of October 2–3, 1974, the First National Bank and Trust Company of Newtown, Newtown, Pennsylvania, was burglarized. Among the items taken from the bank were $80,000. in blank, American Express travelers checks.

On October 6, 1974, James McHugh, a police officer in Dade County, Florida, was alerted by other officers to the fact that two men and a woman were passing stolen travelers checks at various motels in the Miami area. In each instance, one or more travelers checks was used to pay for a motel room with a return of cash as change. Suspicion was aroused when an alert desk clerk, who worked at two motels, recognized that the same individual had registered at both within a short time.

As a result of information he received from one of its employees, Officer McHugh went to the Chateau Motel, Miami, and took the defendant, Delores Pollack, into custody at about 2:30 p. m., October 6. At the time of her arrest, Mrs. Pollack's purse was clutched in her hands. Officer McHugh searched it for weapons and then gave her the Miranda warnings which she said she understood. Mrs. Pollack identified herself as Ann Matt, and in her bag were various items of identification in that name. However, she was unfamiliar with her supposed date of birth and other data on the cards she was carrying. In addition, she had 36 American Express travelers checks, now admittedly stolen from the Newtown bank.

Since Mrs. Pollack matched the description of one of the persons who was circulating the stolen travelers checks and since she negotiated such a check at the Chateau Motel, I conclude that there was probable cause for her arrest. The seizure of her purse was incident to that arrest and was therefore lawful.

Following her arrest, Mrs. Pollack was interviewed by two Dade County detectives, Fred Pelney and Terry Palmer. Again she was advised of her Miranda rights, which she said she understood. She agreed to speak to the officers.

She told them her name was Delores Whitehead and that she had purchased $2000. in travelers checks for $500. from two brothers, Mike and James Thomas, at a bar in Philadelphia, knowing the checks to have been stolen. She then said she had flown to Florida and had commenced cashing the checks. The officers knew that Mrs. Pollack had been driving a vehicle since keys for it were found in her purse. In addition, the reports from the various motel employees indicated the use of an automobile. They asked her about the car and she admitted possession of a rented vehicle and gave them consent to search it, signing an appropriate form. She also told them her true name was Delores Pollack as identification in the car would show. The propriety of the car's search is not challenged.

William Blackburn, Jr., is employed in the Miami area as an investigator for American Express. Having learned that stolen American Express travelers checks were being passed in the motel area and that Mrs. Pollack had been arrested, he went to the Dade County po-

lice headquarters where she was being held. When Detectives Pelney and Palmer left the station to go to Mrs. Pollack's automobile, Blackburn requested permission to accompany them because he thought that the remaining stolen checks might be in her vehicle.

At approximately 7:30 p. m., the detectives and Mr. Blackburn went to the Chateau Motel, the motel where Mrs. Pollack had been arrested, and there found a rented automobile bearing New Jersey license plate, 135CAF. In the glove compartment of this car was a red wallet which contained a photograph of Mrs. Pollack with five other persons and a small white poodle. In addition, there were a variety of identification cards including those of Delores Pollack, Delores Stewart, Delores Gramigna, and Delores Whitehead. There were also seven different motel keys and a matchbook cover from an eighth motel, the Olympia.

After calling several motels to see if there were any additional reports of travelers checks having been presented by persons matching the descriptions already on hand, the officers went to the Olympia where they spoke to the desk clerk. They told him they had reason to believe that two white men, between the ages of 20 and 30, one of whom had a mustache, and a white woman, aged 30 to 40, were passing stolen travelers checks. They asked if persons matching those descriptions were at the motel and he directed them to Room 121. Detective Pelney and Mr. Blackburn proceeded along an outside corridor to see if there was any vehicle at the room in question. When they reached Room 121, they observed that the door was wide open, the television set was on, and they saw a man whom Detective Pelney identified at the hearing as the defendant, George Stegmaier, seated on the bed. Stegmaier was holding a small, white poodle.

Detective Pelney identified himself and asked the man his name. Stegmaier gave a name and said that he was from New York. He stated he was staying with another man in this room and that the other man was out with his girlfriend and that his, Stegmaier's, identification was in his friend's car. Detective Pelney felt that Stegmaier fitted the description of one of the men for whom he was looking since he was of the same approximate age and height, clean shaven, and had brown hair.

Nonetheless, Detective Pelney and Mr. Blackburn returned to the motel desk. Blackburn commented that the dog which the man in the motel room was holding looked like the dog which was in the picture of Mrs. Pollack. Detective Pelney then examined the registration card for Room 121. He saw that it had been engaged by Michael Thomlin and James Sill and that reference was made to a vehicle bearing license 135CAF, the same license number of the car which they had searched at the Chateau Motel.

He and Detective Palmer, with Blackburn following, then went back to Room 121 to arrest the occupant Pelney had seen there. When they arrived, the door was closed but they could still hear the television set. The blinds were also drawn. Receiving no response to their knock, they obtained a passkey and entered. They searched the bathroom, closet, and under the beds, looking for the man with whom Pelney had just conversed or his companion, but found no one—although the dog was still present. There was luggage, clothing, a variety of other articles, and on one of the beds, Mr. Blackburn saw a folded, white paper bag. Through it he could see a bluish tinge. From this color, the size, and shape of the bag, he concluded it contained American Express travelers checks. He opened it. Inside were 340 travelers checks with a face value of $19,800, admittedly stolen from the Newtown Bank. Detective Pelney picked up other items, including a letter addressed to Mrs. Pollack. Meanwhile, Detective Palmer left the room to give chase to someone he had seen whom he thought might be the defendant or his

companion. However, it was dark and he was unable to apprehend anyone.

Although the room was placed under surveillance for several hours, no one returned to it. Detective Pelney then went back to the Dade County Jail where he talked with Mrs. Pollack, showed her the travelers checks and told her about the dog which she said was hers.

Both Mrs. Pollack and Stegmaier assert that the search of the motel room and the seizure of articles from it was unlawful. However, I reject their contention.

▇ At the time of her arrest, Mrs. Pollack was known to have negotiated at least one stolen travelers check when she registered at the Chateau Motle. Mrs. Pollack gave two names which she admitted were false. Her automobile yielded additional identification cards and the keys to seven motels. Neither defendant contends that the search of the car or its contents was improper and that search led to the Olympia where the defendant, Stegmaier, was seen in the open room. He not only matched the description of one of the men who had been passing stolen travelers checks, but was holding a dog which looked like the dog in the picture found in Mrs. Pollack's wallet. In addition, the registration card for the motel referred to the vehicle which had been in Mrs. Pollack's possession and to Michael and James, the names Mrs. Pollack had used to described the men from whom she said she got the travelers checks. When Stegmaier was questioned, he referred to another man and a woman. Thus, it was logical for the police to conclude that Stegmaier was involved in the passing of the stolen travelers checks. When they returned to the room and now found the door closed, they had good reason to believe that the man with whom Pelney had just spoken, his companion or both, might be there, or that if they had fled, clues as to their whereabouts might have been left behind. Under the circumstances, it was entirely proper for them to enter the room in pursuit of Stegmaier or the other man, without waiting to obtain a warrant. See *Warden, Maryland Penitentiary v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). The incriminating travelers checks were found in plain view in the room, not by the police, but by an agent of American Express which had issued the checks. There was nothing to show that Blackburn was acting for the police, serving their interests, or doing their work. On the contrary, all of the evidence shows that Blackburn was a private investigator, permitted to accompany the police on their search for the stolen travelers checks in view of the large amount involved and the understandable desire of his company to effect a complete, immediate recovery of those checks still not placed in circulation. The other items seized in the room were also in plain view. See *Coolidge v. New Hampshire*, 403 U.S. 443, 465, 91 S.Ct. 2022, 29 L. Ed.2d 564, rehearing denied 404 U.S. 874, 92 S.Ct. 26, 30 L.Ed.2d 120 (1971). There is no basis to suppress the search of the Olympia motel room or the evidence seized there.

Carlis Sabinson is a special agent of the FBI assigned to investigate the Newton Bank burglary.

As a result of phone calls from Special Agent James P. Tucker, of the FBI, who had spoken with Mrs. Pollack in Florida and from Mr. Blackburn of American Express, Sabinson learned of Mrs. Pollack's arrest. Her name was familiar to him because she had been prosecuted in Bucks County in connection with a stolen car. From a Bucks County detective, Sabinson learned that the defendant, Stegmaier, had been living with Mrs. Pollack in Levittown.

On December 6, 1974, Special Agent Sabinson interviewed Mrs. Pollack. He read to her the Miranda warnings and she stated that she understood them and would talk with him. She waived her right to remain silent and to have counsel present during the interview. Mrs.

Pollack repeated to Sabinson the story that she had given in Florida, that is, she had bought $2000. worth of travelers checks at a bar in Philadelphia from two brothers whom she identified as Michael and James Thomas. She also said that she knew these checks were stolen. Although she admitted seeing Stegmaier in Florida, she said that it was a chance meeting and she said nothing which in any way might have implicated Stegmaier in the theft or the passing of the travelers checks.

Special Agent Sabinson talked with Mrs. Pollack again on December 27, 1974. After he read the Miranda warnings she said she would talk with him, thus waiving her right to remain silent and to have the assistance of counsel. However, shortly after the conversation began, Mrs. Pollack remarked that she would be cooking her own goose by giving information to Sabinson and that she wanted an attorney. At that point the conversation was terminated by Sabinson although he proceeded to take her fingerprints. While her fingerprints were being taken, Mrs. Pollack fainted and then fainted again while she was being returned to her cell at the Bucks County Prison.

Mrs. Pollack asks that statements given to the FBI on December 31, 1974, and January 28, 1975, be suppressed. Since there was no evidence of any statements which she gave on those dates, I assume that her motion is directed toward her statements of December 6 and December 27, 1974. In support of her motion, Mrs. Pollack argues that the statements were involuntary because of her physical condition. She introduced evidence to show that for approximately two years she had been taking a variety of medicines, including Valium and nitro-glycerine for the relief of various symptoms, including chest pains [1] and fainting spells. These medicines had been prescribed by her private physician and had been made available for her at the Bucks County prison.

Mrs. Pollack stated that the Valium made her calm, sleepy, and relaxed, but eventually she stopped taking it because it also made her feel scatterbrained and interfered with her ability to remember things.

A matron for the Bucks County prison, Mrs. Brown, testified as to the medicines which Mrs. Pollack took and the effect they had on her. Mrs. Brown said that at times Mrs. Pollack was incoherent, suffered from dizziness, fainted, and on occasion would act like a zombie. In addition, medical records from the Prison, Mrs. Pollack's physician, and various hospitals were also received. Finally, I was asked to read three articles from medical publications about Valium.

Neither the various segments of this evidence nor its totality raises any question as to the voluntariness of Mrs. Pollack's statements on December 6 and 27. There is no record at all which refers to December 6 except as to Mrs. Pollack's age and blood pressure. The records for December 27 show that she received Premarin (prescribed by the family doctor for an estrogen deficiency), a nasal decongestant because she had a cold, chloral hydrate to help her sleep and Valium, 5 mg., four times a day. Apparently it is the Valium which Mrs. Pollack contends made her statements involuntary.

To establish the effect of Valium, Mrs. Pollack introduced into evidence two articles from the New England

[1]. Nitro-glycerine is a common remedy for coronary insufficiency. Although reference to three different electrocardiograms are contained in Mrs. Pollack's medical records, there is no indication that she has ever had any myocardial damage. As a result of an examination in Florida shortly after her arrest it was suggested that nitro-glycerine be discontinued. On January 30, 1975, the Doylestown Hospital found "no heart disease." A report from Philadelphia General Hospital, March 14, 1975, states she does not need medication for her chest pain nor need her activity be restricted.

Journal of Medicine for 1974[2] and the Physician's Desk Reference, 1975.[3] In summary these articles say that Valium is the trade name for diazepam, one of the benzodiazepine family of anti-anxiety agents. In 1972, more than 77 million prescriptions for benzodiazepines were filled in American retail pharmacies, of which two-thirds were for Valium. It is the most commonly used drug in the Western world. In a three month period, approximately one in 10 American adults will take Valium because of tension and nervousness. Although repeated dosages of benzodiazepines lead to its accumulating in the body, the side effects of tranquilizers and other antidepressants are far more frequent and severe.

The unwanted effects and hazards of benzodiazepines include fatigue, drowsiness, somnolence, muscle weakness, nystagmus (rapid eyeball movement), ataxia (failure of coordination), and dysarthia (imperfect articulation). Although tests with animals show that benzodiazepines may produce passivity or a "taming" effect, there were no reports of corresponding tests so far as humans are concerned. It was also noted that in some animals, Valium produces hostile behavior and fighting. Both the articles in the New England Journal of Medicine and the Physician's Desk Reference, 1975, warn that reaction time, mental coordination, and intellectual function *may* be affected and thus that there *may* be a danger in operating machinery or in driving a motor vehicle.

There was no testimony that the Valium or anything else had any adverse effect on Mrs. Pollack on either December 6 or December 27 at any time, much less at the time Mrs. Pollack talked with Special Agent Sabinson. Mrs. Brown gave no such testimony, Mrs. Pollack gave no such testimony, and Sabinson said he detected no abnormality in Mrs. Pollack's appearance or conduct. It is significant that none of the medical personnel from the Bucks County Prison, Dr. Loudenslager, Dr. Haeckler, or the nurse, Margaret Moran, appeared to testify as to Mrs. Pollack's condition in general or on the days in question. While I do not know whether Mrs. Pollack's statement on December 6 was true or not, it was consistent with what she told the officers in Florida at the time of her arrest two months before and it did not incriminate Stegmaier, who at the hearing on these motions described himself as her common law husband. So far as December 27 is concerned, Mrs. Pollack terminated the conversation almost immediately.

■ In brief, there was no evidence that Valium affected Mrs. Pollack at either time when she talked with Sabinson and there is much to suggest that her memory and thought processes were intact. Moreover, there is the testimony of H. John Witman, Esquire. Mr. Witman is in the Public Defender's office, Bucks County. He represented Mrs. Pollack at proceedings there and saw her on three occasions, December 16, January 30, and February 3. On December 16, the medical records show Mrs. Pollack had Valium 5 mg. four times a day, the same dosage she received on December 27 when she spoke with Sabinson. However, on January 30 and February 3, the Valium dosage was doubled. Nonetheless, Mr. Witman testified that in the four to six hours he saw her over those three days there was nothing he observed[4] which indicated any need for a mental or physical examination, nor to suggest to the trial judge, who was considering whether Mrs. Pollack had violated her probation, that there was any mental incapacity on her part.

2. Greenblatt & Shader, *Drug Therapy: Benzodiazepines (Part I)*, 291 New England J. of Medicine 1011 (1974); Greenblatt & Shader, *Drug Therapy: Benzodiazepines (Part II)*, 291 New England J. of Medicine 1239 (1974).

3. Physician's Desk Reference 1262–63 (29th ed., B. Huff ed. 1975).

4. At least, he noticed nothing until Mrs. Pollack fainted while a finding of guilt was being pronounced.

I conclude that Mrs. Pollack waived her constitutional rights prior to making her statements to Special Agent Sabinson and that she acted voluntarily, unaffected by Valium or any other medication. I conclude that her will was not overborne and that her statements were the product of a rational intellect. See *United States v. Arcediano*, 371 F.Supp. 457, 466–67 (D.N.J.1974). There is no basis to suppress her statements.

On December 31, 1974, Special Agent Sabinson went to the Burlington County Prison, New Jersey, and interviewed Stegmaier. Stegmaier was given the Miranda warnings and knowingly and intelligently waived his right to remain silent and to the assistance of an attorney.

Sabinson told Stegmaier that he was investigating a bank burglary and Stegmaier asked him if it was the one at Newtown. Stegmaier then stated that he was interested in seeing to it that Mrs. Pollack would not go to jail because of the events in Florida. He talked about the Newtown burglary, but only in the abstract. He wanted to know what the FBI could offer him and Sabinson told him that the FBI could make no promises. Sabinson also suggested that Stegmaier should get an attorney to negotiate for him, but Stegmaier said he would make his own deals.

After this conversation, Sabinson talked with Joseph M. Fioravanti, Esquire, an Assistant United States Attorney, to whom the Newtown bank burglary case had been assigned. Mr. Fioravanti told Sabinson that no promises could be made to Stegmaier but Stegmaier could be told that any information he gave would be considered by the United States Attorney's office as to his case and as to Mrs. Pollack's.

In January, 1975, Sabinson helped to arrest Stegmaier, who had escaped from the Burlington County Prison, and on January 28, 1975, Sabinson went to see Stegmaier at the Bucks County Prison, Doylestown, Pennsylvania. The Miranda warnings were repeated and again

Stegmaier waived his constitutional rights and elected to talk with Sabinson.

Sabinson stated the nature of his investigation and Stegmaier said he was still concerned about Mrs. Pollack. Before he would talk to Savinson, Stegmaier said he wanted to be assured that Mrs. Pollack would get probation. Sabinson said he could give no such promise, repeating what Mr. Fioravanti had said, that is, any cooperation on Stegmaier's part would be considered in his case and Mrs. Pollack's. At Stegmaier's request, he was allowed to speak with Mrs. Pollack, who was also incarcerated at the Bucks County Prison. After conversing with her for approximately eight minutes, Stegmaier agreed to talk to Sabinson. He then made a statement implicating himself in the Newtown bank burglary and in the cashing of the stolen travelers checks in Florida, although he said that he had not actually passed any of the checks himself.

█ Stegmaier maintains his statements of December 31, 1974, and January 28, 1975, should be suppressed because they were obtained as a result of trickery, coercion, and false promises and thus were involuntarily given. The evidence, however, does not support Stegmaier's contention.

Stegmaier argues that when approached by Special Agent Sabinson he made known his interest in Mrs. Pollack's welfare and his desire that she be placed on probation. Stegmaier does not assert, however, that any promise was made to him at the time of the first interview. To the contrary, he stated that Sabinson told him the FBI was not then in a position to make any promise. It is only with reference to the second conversation that there is any clash in the evidence. Special Agent Sabinson testified that although Stegmaier raised a question about probation for Mrs. Pollack, he, Sabinson, said no promises could be made except to bring to the attention of the United States Attorney any cooperation received from Stegmaier

—and that such cooperation would be considered so far as both Stegmaier and Mrs. Pollack were concerned. Stegmaier, on the other hand, stated Sabinson told him that he had talked with the United States Attorney on several occasions, and that there was no problem about Mrs. Pollack, and that she would be placed on probation.

Insofar as there is a conflict between the testimony of Sabinson and Stegmaier, I accept Sabinson's version. Stegmaier argues, nonetheless, that even under Sabinson's recitation of the facts, the confession was involuntary because it was stated that Stegmaier's cooperation would be considered by the United States Attorney not only so far as Stegmaier was concerned but also with regard to Mrs. Pollack. In other words, Stegmaier contends that the agreement to consider his cooperation in Mrs. Pollack's case made his statement involuntary.

 It is axiomatic that for a confession to be admissible, it must be voluntary. In resolving the issue of voluntariness, the totality of the circumstances must be considered, *Boulden v. Holman,* 394 U.S. 478, 480, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969), including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement, *Brown v. United States,* 356 F.2d 230, 232 (10th Cir. 1966).

Stegmaier has had prior brushes with the law. Although I do not know the details of his criminal record, during the hearing it was said he had been a fugitive from a Bucks County burglary charge. In his statement of December 31, 1974, he made it plain that he considered himself to be an accomplished criminal. When advised to get an attorney, he rejoined that he would make his own deals. Later he escaped from prison. The reading of the Miranda rights seemed to bore him. At the hearing he said he considered himself to be reasonably intelligent and street wise. It is important to note that he was the one who initiated the conversation about probation for Mrs. Pollack on both occasions. The conclusion is inescapable that Stegmaier was mature and experienced, well able to look after his own interests during questioning. The fact that he implicated himself in an effort to secure the best possible disposition of the charges against Mrs. Pollack does not render his statement involuntary. *Vogt v. United States,* 156 F.2d 308, 312 (5th Cir. 1946); *United States v. Reese,* 351 F. Supp. 719, 721 (W.D.Pa.1972), and authorities cited therein. See also *United States v. McShane,* 462 F.2d 5, 7 (9th Cir. 1972).

I conclude that Stegmaier's statements to the FBI were made voluntarily, of his own free will, and not as a result of any improper inducement, threat, or promise. There is no basis for suppression